**UNITED STATES of America,
Appellee,**

v.

**Angelo MELE et al., Appellants.**

Nos. 213–216, 236, 779–783,
Dockets 71–1579, 1619, 1620, 1685
and 1875.

United States Court of Appeals,
Second Circuit.

Argued Oct. 14, 1971 and April 4, 1972.

Decided June 15, 1972.

Joseph I. Stone, New York City, for defendant-appellant Ralph Cuomo.

H. Elliot Wales, New York City, for defendant-appellant Beltempo.

Jerome Lewis, New York City, for defendants-appellants Mele and Coniglio.

Robert Morse, U. S. Atty., E. D. N. Y., Roger A. Pauley and John J. Robinson, Attys. for Dept. of Justice, Washington, D. C., for plaintiff-appellee.

Before FRIENDLY, Chief Judge, KAUFMAN, Circuit Judge, CLARK, Associate Justice.*

Mr. Justice CLARK:

■ Appellants Mele, Beltempo, Cuomo and Coniglio along with Arthur Madonia, now deceased, were convicted by a jury on charges of violations of the narcotics laws. On appeal we remanded for a hearing on a motion for new trial based on newly discovered evidence. It is now here on second appeal with the Government having confessed to the covert use of one of the defendants as an informer, the covert excision of relevant Jencks Act[1] material from records given the defense and the concealment of impeaching evidence against its chief witness. This conduct compels us to direct a new trial.

1. *Statement of the Case*

The Government charged, and its proof at trial offered two overt acts in the furtherance of a conspiracy to transfer two kilograms of heroin from Mele to Cuomo. First, by the testimony of Special Agents O'Brien and Maltz, the Government sought to show that Mele, Madonia and Coniglio met on June 30, 1969, at the Pussy Cat Lounge. Both

officers testified that on this occasion they overheard Mele instruct Madonia and Coniglio to deliver two kilograms of heroin to Cuomo the next day. Secondly, by the testimony of O'Brien, the Government sought to show that Coniglio and Madonia met with Cuomo and Beltempo the following night and arranged for the transfer. It was accomplished, State Trooper Padula testified, by Coniglio transferring heroin from his car to that of Beltempo. Soon thereafter Beltempo drove away in his car with Cuomo following in an Oldsmobile. A short while later they were stopped by other officers and the heroin was found in Beltempo's car. Coniglio and Madonia categorically denied the Government's proof and the jury by its verdict resolved the direct conflict in crucial testimony in favor of O'Brien and Maltz. This was on March 16, 1971.

On July 30, 1971, while appeal was pending, appellants filed an application for a remand for the purpose of a hearing on a motion for new trial based on the newly discovered evidence that one of the defendants, Madonia, was an informer and that O'Brien had been indicted for perjury. The Government opposed the application through the affidavit of the chief prosecutor alleging as to the informer claim that there was "no credible and relevant evidence to support the motion for a new trial." As to the O'Brien matter, the affidavit stated that the prosecution was not aware of the accusations at the time of the trial

---

* Associate Justice of the United States Supreme Court (Retired) sitting by special designation.

1. 18 U.S.C. § 3500:

"(b) After a witness called by the United States has testified on direct examination, the court shall, on motion of the defendant, order the United States to produce any statement (as hereinafter defined) of the witness in the possession of the United States which relates to the subject matter as to which the witness has testified. If the entire contents of any such statement relate to the subject matter of the testimony of the witness, the court shall order it to be delivered di-

rectly to the defendant for his examination and use.

"(c) If the United States claims that any statement ordered to be produced under this section contains matter which does not relate to the subject matter of the testimony of the witness, the court shall order the United States to deliver such statement for the inspection of the court in camera. Upon such delivery the court shall excise the portions of such statement which do not relate to the subject matter of the testimony of the witness. With such material excised, the court shall then direct delivery of such statement to the defendant for his use."

of this case. A panel of this court (Feinberg, Mulligan and Timbers, JJ.) denied the motion "without prejudice to the seeking of the remedy from said district court." The appellants then sought relief from the district court. At the hearing a longhand document, dated July 22, 1971, and signed by Madonia but not properly notarized was admitted in evidence. It alleged that he had been arrested and turned informer for the Government on June 27, 1969, and continued as such until a few weeks after his conviction; that he had planted the heroin in Beltempo's car, and that the Government had furnished the heroin and had planned the transfer and sale complained of in the indictment. The Government again contended by affidavit that there was no "credible and relevant evidence" supporting the granting of a new trial. A copy of the Government's affidavit is attached (Appendix A). On September 1, 1971, the district court denied the motion for a new trial without hearing any witnesses, but stated that this was without prejudice to renewal "on an affidavit or affidavits concerning defendant Madonia's assertions." Madonia died of multiple bullet wounds some seven days after the denial of the motion for a new trial. The case then came here for oral argument. The newly discovered evidence was not mentioned in the appellants' brief which had been filed on the same day that the district court denied a motion for a new trial. The Government's brief, filed September 30, 1971, stated only that the informer Madonia "was killed in September, 1971, and his cause has therefore abated." At argument the appellants made reference to the informer status of Madonia, and the court therefore suggested that they file a supplemental brief thereon, which was done on October 20, 1971. On November 22, 1971, the Government filed a memorandum prepared by the Justice Department attorney who had argued the case on appeal but who had not participated in the trial. This memorandum stated, "we deem it our duty to disclose the fact that, since oral argument on Oc-

tober 14, 1971 we have discovered that the deceased co-defendant Madonia had had contacts with the Bureau of Narcotics and Dangerous Drugs." It was the Government's position that although Madonia was a part-time informer for the Bureau of Narcotics and Dangerous Drugs, he had played a dual role and was in fact a full-time criminal participant in the transaction for which he was convicted. The Government continued to assert that Madonia furnished no information relevant to the prosecution in this case. It was also argued that the prosecutor properly withheld the information about Madonia for fear that this information would result in retaliation and harm to him. A copy of this memorandum is attached. (App. B) We then remanded for the purpose of a hearing on the motion for new trial on newly discovered evidence.

## 2. *Developments at the Evidentiary Hearing*

The evidentiary hearing produced additional revelations that seriously tainted the Government's case.

(1) At the original trial, no evidence was produced about Madonia's prior arrest on June 27, 1969, and his informer role since that date. In the memorandum submitted to us by the Government on November 22, 1971, some disclosures were made for the first time, but we were assured that "no useful information was developed from" Madonia and that Madonia had been acting on his own on the narcotics transaction charged in the indictment and "gave no information" thereon against these appellants.

The evidence at the evidentiary hearing on the motion for new trial shows, however, that Madonia was an "important informer" for the Government from the date of his arrest on a different narcotics charge on June 27, 1969, to April 1971; that he received exempt status as an informer; that he was paid at least $700 for his services which was charged to this case on the Bureau's records. While the evidence at the evidentiary hearing does not affirmatively show that

Madonia furnished information bearing directly on this case subsequent to its filing, that record does reveal that he tipped off Supervisor Vecchione about this very transaction and that his tips led to the arrests on July 1st and this prosecution. Indeed, on June 27, 1969, the very day of his first arrest, Madonia told Supervisor Vecchione of an expected meeting with Mele to transact a transfer of heroin. At that time Vecchione gave Madonia his and Agent O'Brien's telephone numbers so "he could call either one" in the event "something transpired [with Mele] over the weekend." On June 30 Vecchione again conferred with Madonia, and the latter advised of the anticipated meeting that night:

"Q. When you directed your agents to surveil, surveil Mr. Mele, at that time you knew or you had been told that Mele was to meet Madonia that evening; is that correct?

"A. I was told by Madonia that he would probably see Mr. Mele that evening.

"Q. And that was the purpose— and that is why you directed your agents to surveil Mele; isn't it?

\*    \*    \*    \*    \*    \*

"A. It was one of the reasons."

The following day, Vecchione and Madonia had their third conference in five days on the facts leading up to this case. Assistant Regional Director Holtman of the Narcotics Bureau accompanied Vecchione to Madonia's home on this occasion. The chief prosecutor inquired of Vecchione concerning this meeting:

"Q. I now direct your attention to the date of July 1st; did you see or hear from Madonia that day? . . .

"A. Yes, sir. Myself and my Supervisor went to see Mr. Madonia.

\*    \*    \*    \*    \*    \*

"Q. Where did you see him?

"A. Staten Island.

"Q. Did you have a conversation with him?

"A. Yes, sir. I approached him. I asked him what was doing? He said,

'Nothing.' I said, 'When do you plan on seeing Angelo Mele? He said, 'Probably tonight.'

"Q. Did Madonia tell you on that occasion that he, in fact, had seen Mele that night before in the Pussycat Cafe?

"A. No.

\*    \*    \*    \*    \*    \*

"Q. As a result of that conversation with Madonia, what, if anything, did you do?

"A. I went to a telephone booth which was located near a diner on Highland Boulevard and Clo Road and we called the State Troopers.

\*    \*    \*    \*    \*    \*

"Q. What did you tell or request of the troopers when you called on July 1st?

"A. To surveil Mr. Madonia.

"Q. Did you tell them where he might be found, and so on?

"A. Yes, there were other agents present there that joined the troopers. I completely stayed away from there because they knew me but they were briefed as to Madonia's residence, and then he was to be tailed.

"Q. Did you tell the state police that you expected a delivery to be made?

"A. Yes."

After his arrest at his daughter's home about midnight July 1, 1969, Madonia voluntarily gave the arresting agents twenty-two kilograms of heroin that he had hidden under a bed in her home. However he was placed in jail under $100,000 bond until July 23 when he was released on $5,000 bond. The bail bonds of the remaining defendants were many times greater than Madonia's. Clearly, his low bond was because of his informer status, and this is buttressed by his continuing to inform. On July 28 Madonia contacted Supervisor Vecchione and offered "to surrender a quantity of heroin which he had in his possession and which he later stated was part of a 24-kilogram cache [22 kilograms of

which he voluntarily surrendered at the time of arrest around midnight on July 1st] seized by Bureau of Narcotics and Dangerous Drugs on July 1, 1969 and July 2, 1969 in Brooklyn and Staten Island, New York." Vecchione advised Agents Kennedy and Caffrey of this offer and on July 28 Madonia voluntarily surrendered a package of heroin weighing 751.1 grams. On September 16, 1969, Madonia was registered by the Bureau as an "exempt informer" with the alias of Michael D. Arthur, the same name assigned to him on June 27, 1969. The records produced at the hearing on the motion for new trial include many narcotic agent reports concerning Madonia's cooperation as an informer. For example, Vecchione reported that Madonia "has been in constant contact with Angelo Mele since his arrest"; that Madonia told him that Mele has been since his arrest attempting another delivery so that "he can leave his family money before going to jail." Another report recited that Vecchione instructed Madonia "to maintain constant communication with Mele . . ." and a later one noted that Madonia was socializing with Mele on a reguar basis and in a recent conversation Mele indicated that his "partners" had promised him a large amount of heroin by year end. This informer arrangement continued all during the trial with Madonia sitting each day at the defense table. Madonia and the appellants were convicted on March 16, 1971, and some two weeks later, on April 2, 1971, Supervisor Vecchione filed his report:

> "*Other than the information that 0078 (Madonia) supplied relative to the case in which he was a defendant along with Angelo Mele, Vincent Beltempo, Ralph Cuomo he was not able to furnish any additional information.*" (Emphasis supplied)

He then recommended that Madonia's service be terminated. On April 6, 1971, Madonia was removed from his exempt status "in view of his conviction, the fact that he has not furnished information of a substantial nature, and his

claims that he is suspected of being an informant . . ."

(2) The evidentiary hearing at the motion for new trial also revealed that the Chief Prosecutor had personal knowledge of the informer status of Madonia. Indeed, he. delayed Madonia's arraignment in connection with the latter's June 27 arrest in order to give Madonia time to inform for the Government. The arraignment was never held, and instead of prosecuting Madonia under the charges connected with the June 27 arrest, and running the risk of disclosure of his informant role, the Government listed the heroin seized and Madonia's Cadillac car impounded at that time under the fictitious name of Michael D. Arthur. The report of this arrest; Madonia's voluntary surrender of 22 kilograms of heroin and the unusual circumstances of his arrest around midnight on July 1 at his daughter's home were all excised from the official reports turned over at the time of trial to the defense pursuant to the Jencks Act, 18 U.S.C. § 3500. Moreover, this report was written so as to indicate that Madonia was arrested at his home, which was false.

(3) In the memorandum submitted by the Justice Department, we were assured that O'Brien and Maltz "were not known to Madonia" at the time of the meeting on June 30, 1969, when they observed him in the Pussy Cat Lounge. The evidentiary hearing revealed, however, that they had been the lead officers in the arrest of Madonia just three days before. On that occasion Agent Maltz actually took Madonia from his Cadillac and directed him to spread over the fender while he was being frisked. Agent O'Brien placed him under arrest, took the package of heroin from the front seat and read Madonia a statement of his rights. At that time, Maltz wore a bushy moustache, which the trial court found "would have made him conspicuous."

(4) At the trial, Agent Maltz testified that he observed Madonia leave the premises of the Pussy Cat on June 30 in his 1963 Cadillac when in truth the car was impounded by the Government at that

time. This testimony was in contradiction to Madonia's testimony that the Cadillac was "stolen" and Coniglio's testimony that Madonia borrowed his Buick fom June 30 to July 2 because his Cadillac had been stolen. The prosecutor made much of this conflict, pursuing it with Madonia and mentioning it in his summation to the jury.[2] Likewise it was emphasized in his affidavit to us. See App. A, p. 2.

In the evidentiary hearing, the agents confirmed that Madonia's car had been impounded on June 27, 1969, and had been in the Government's possession ever since. However, they had sought to conceal this fact from the defense, as is shown by the report of the narcotic agent O'Brien on the surveillance of Madonia on July 1, which was made available at trial:

> "On July 1, 1969, surveillance was established of Arthur Madonia at his residence 43 Neptune Street, Staten Island, N. Y. *Madonia was known to operate a 1963 Cadillac Sedan New York License No. 6379 CR* . . .

> "At approximately 9 p. m. Madonia was followed by the Agents of the Eighth Enforcement Group from his residence to Villa's Lounge . . ." (Emphasis supplied)

Agent O'Brien knew at that time that Madonia's Cadillac had been seized by the Government three days before. Still he made this report knowing that it would be available to defense counsel in this case. And he inserted the italicized sentence in his report, indicating to a reader thereof that Madonia was driving the Cadillac on June 30 and July 1st. O'Brien knew that this was not true. Moreover, the deceit was carried forward in the cross-examination of Madonia. There he was asked: "Now, you testified that you reported this car stolen to the police at the 17th Precinct, did you say? On the East Side?" And when

Madonia answered: "I don't know what precinct it was," he was then asked: "And have you checked recently with that station house about this larceny?" Madonia's answer was "No, sir" but the prosecutor pressed, "You didn't go over there in the course of this trial, to check their records?", and again Madonia answered, "No, sir." The sole purpose of this questioning was to cast doubt on Madonia's testimony that his car had been stolen and was, therefore, not available which would question his general credibility as well as cast doubt on Coniglio's testimony that Madonia had borrowed his Buick.

We are told that the chief prosecutor did not know that the Cadillac had been impounded when he asked Madonia about it or when he made his statements in summation. We have received similar assurances on other facets of this case. We do know, however, that the chief prosecutor was advised when Madonia was arrested on a narcotics charge and had turned informer. Moreover, Agent Vecchione testified that he "could have" informed the prosecutor of the impounding of the Cadillac at the very time that the chief prosecutor was cross-examining Madonia. But even assuming that the chief prosecutor did not know, the record is clear that narcotics agents were present at the time of the cross-examination of Madonia who did know and had ample opportunity to correct any misapprehensions that the prosecutor might have had on this crucial point of the trial. As was said in Napue v. Illinois, 360 U.S. 264, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959): "The same result obtains when the State, although not soliciting false evidence, allows it to go uncorrected when it appears." At 269, 79 S.Ct. at 1177.

3. *Government Suppression of Material Evidence*

　　It is true that ordinarily a trial court need not grant a motion for

2. The chief prosecutor told the jury: "There was good reason for Mr. Coniglio to want you to believe that he was not in possession of the Buick on July 1st. You can consider that a factor in determining whether Mr. Coniglio or Mr. Madonia would like to depart from the truth in their testimony."

new trial under Rule 33 unless the newly discovered evidence will probably result in a different verdict or sentence for the defendant. See, e. g., United States v. Cousins, 429 F.2d 1271 (9 Cir. 1970), cert. denied 400 U.S. 904, 91 S.Ct. 143, 27 L.Ed.2d 141 (1970). Due process requires, however, that a different rule be applied when prosecutorial suppression has caused the evidence not to be presented at trial. At least where the suppression is deliberate, the defendants need only show that the evidence is material and could in any reasonable likelihood have led to a different result on retrial. Giglio v. United States, 405 U.S. 150, 154, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972). See also United States v. Keogh, 391 F.2d 138 (2 Cir. 1968); Kyle v. United States, 297 F.2d 507 (2 Cir. 1961). In these cases, where there has been a considered decision to suppress and where the value of the information "could not have escaped the prosecutor's attention," United States v. Keogh, supra, at 147, it is not necessary to engage in any exact determination of the degree of prejudice to the defendants.

"The reason why the showing of prejudice required to bring down the balance in favor of a new trial will vary from case to case is that the pans contain weights and counterweights other than the interest in a perfect trial. Sometimes only a small showing of prejudice, or none, is demanded because that interest is reinforced by the necessity that 'The administration of justice must not only be above reproach, it must also be beyond the suspicion of reproach,' . . . and by the teaching of experience that mere admonitions are insufficient to prevent repetition of abuse. See Mapp v. Ohio, 367 U.S. 643, 81 S.Ct. 1684,

6 L.Ed.2d 1081." Kyle v. United States, supra, 297 F.2d at 514.

In this case it is clear from its very inception that the prosecution labored to keep vital information from the defense, the trial judge and the jury. In addition, in some official narcotics agents' reports slanted information was inserted and produced to the defense, the judge and the jury in order to enshroud the Government's initial deceit. Moreover, its initial equivocal statement both with the trial court and with us stating there was "no credible and relevant evidence" to support the charge that the Government had planted a paid informer within the intimate circle of the defense, even to the extent of his attendance at the defense table during the trial, is beyond our comprehension[3] and cannot be condoned. In our detailed examination of the pleading, the evidence and the argument of counsel we cannot say that in the light of these deliberate excisions, slanted reports and misrepresentations— made again and then again—that the jury could not in any reasonable likelihood have been affected in its verdict. Giglio v. United States, supra; Napue v. Illinois, 360 U.S. 264, 271, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959).

Of course, even in cases of extreme prosecutorial misconduct, a new trial is not granted if the suppressed evidence or the misleading portions of the Government's case could not possibly have had an effect on the jury's verdict. Our examination of the case here, however, convinces us that if the jury had known the full truth, it might reasonably have reached a different result.

### (a) Madonia's double role

If the jury had known of Madonia's informer status and his acquaintance

---

3. While the Government says that it did not confer with Madonia during the actual trial we do know that Supervisor Vecchione and a trooper conferred with appellant Mele covertly on Staten Island during the trial. Indeed, Mele told them that both Coniglio and Madonia would testify for the defense. Mele also talked to Vecchione after the trial telling him that he thought that Madonia was an informant but that "he liked the kid" and told him to watch out for himself. Vecchione asked Mele about the Madonia affidavit alleging that Madonia was an informer. Mele's reply was, "Well, it's not all B.S."

with Maltz and O'Brien, significant doubts would have been raised about the Government's case. First, since the jury could readily have found that Madonia would recognize Maltz and O'Brien, the jury might doubt that if he were in fact conspiring with Mele and Coniglio he would not have prevented the alleged conversation about the heroin that took place in the Pussy Cat Lounge while both agents were present and within hearing. The jury might conclude from this gap in the credibility of the Government's case that O'Brien and Maltz were not present or if they were, that they did not overhear the conversation to which they testified. The jury might also conclude that, if indeed the conversation did take place, it was a "set-up" and that Madonia was working for the Government in staging this conversation.

If the jury had known of Madonia's informer role, it might also inquire into the events of July 1, and it might choose to believe Madonia's statement that he received the two kilograms of heroin from the Government and planted it in the trunk of Beltempo's car. It might also choose to believe the testimony of Coniglio that he did not participate in the transfer; and it might find that Beltempo and Cuomo were entrapped. If the whole truth had been available, and if the defense were given the opportunity to explore the suppressed evidence, "reasonable doubts" about the defendants' guilt could certainly be raised.

**(b) The Cadillac Testimony**

If the jury had known the whole truth, i. e. that Madonia's Cadillac had been impounded on June 27, 1969, the first effect would be to cast serious doubt on the testimony of Maltz.[4] Maltz testified that on the night of June 30, 1969, Madonia left the Pussy Cat in his Cadillac and Coniglio left in his own Buick. Since this testimony is clearly false, the jury might conclude that Maltz was wrong in other particulars. The jury might then choose to believe instead Coniglio's testimony that Madonia had borrowed his Buick on June 30 and never returned it which was supported by the O'Brien report that the agents had seized the car from Madonia on his arrest around midnight on July 1st; the acceptance of Coniglio's version would, of course, mean that he had not made the heroin delivery. The jury might also reasonably believe Madonia's posttrial statement that *he* had received the heroin from the Government and had planted it in Beltempo's car.

The district court resolved all of these troublesome factual questions in favor of the Government, despite the unusual situations that we have outlined. We cannot but conclude that where the discrepancies between the Government's trial presentation and the true facts reach such proportions that only the jury can resolve the serious doubts remaining.

The Government insists, however, that its failure to disclose was justified since disclosure would create a serious threat to Madonia's life. We cannot accept this latter-day explanation. If the Government had been so eager to protect Madonia's life, why did it not oppose his $5000 bail, nor provide any protection to him, particularly in the six-week period between his admission of his informer role and his murder. Moreover, if this were the only reason for the Government's failure to disclose, why was the truth not immediately revealed to the district court and to this court after Madonia's death? Why did the prosecutor continue in his equivocation during oral argument before this court and for a month afterwards?

---

4. The prosecutor was well aware of this. Indeed in two points of his summation, he referred to the official position of Maltz and other witnesses to reinforce their credibility. At one point, in referring to Maltz and O'Brien, he stated "they were honest officers." At another point, he asked rhetorically: "Do you believe that O'Brien and Maltz would lie to you?" It is clear from the verdict that the jury believed the prosecutor.

Even if the Government had been motivated by the desire to protect Madonia, its deliberate suppression of evidence and preparation of false reports to mislead the defense cannot be accepted. The very least required of the Government was a complete disclosure of the truth to the district court in camera so that the balance of interest could be struck by one not involved in the all too "often competitive enterprise" of prosecution. United States v. Varelli, 407 F.2d 735 (7 Cir. 1969); United States v. Palermo, 410 F.2d 468 (7 Cir. 1969). Particularly since the withheld evidence and the doctored reports were highly material to this case and would so clearly have affected the preparation of a defense, it is clear that some disclosure would have been required. United States v. Roviaro, 353 U.S. 53, 63–64, 77 S.Ct. 623, 1 L.Ed.2d 639 (1957).

4. *Conclusion:*

While Attorney General of the United States I noticed an inscription that was carved in the oak panel of my anteroom and embossed in gold: "The United States wins its point whenever justice is done its citizens in its courts." We regret to say that the record here does not comport with that high standard. The judgment is Reversed.

### APPENDIX A

### AFFIDAVIT OF JOSEPH F. LYNCH

Submitted August, 1971

---

United States of America,

v.

Angelo Mele, Vincent Beltempo and John Coniglio,

Appellants.

---

State of New York,
County of Kings, ss.:

Joseph F. Lynch, being duly sworn deposes and says: I am a Special Attorney assigned to the Organized Crime and Racketeering Section, U. S. Department of Justice. I prosecuted the appellants in the instant case in the Eastern District of New York.

This affidavit is submitted in opposition to appellants Mele, Coniglio and Beltempo's motion to remand this case to the District Court where a motion might be made for a new trial based on newly discovered evidence.

Prior to the sentence of the appellants, one of their codefendants brought a similar motion for a new trial based on newly discovered evidence. That motion alleged that Federal narcotics agent, John O'Brien of the Bureau of Narcotics and Dangerous Drugs, a witness for the prosecution in the instant case, was being investigated by a federal grand jury in the Southern District of New York during the prosecution of the instant case and that this information should have been turned over to the defendants during the trial. Your deponent during the argument of that motion represented to the District Court that your deponent was not aware that Agent O'Brien was under such an investigation during the instant trial and your deponent reiterates the same representation under oath in this affidavit.

Concerning the additional newly discovered evidence propounded in the affidavit of co-defendant Arthur Madonia, your deponent wishes to advise that this same co-defendant Madonia was called on the instant trial in a rather unusual and unorthodox manner as a witness for the appellants Mele and Coniglio. Madonia under oath before the jury testified that he reported the theft of his 1963 Cadillac to the New York City Police Department on June 27, 1969; that on July 1, 1969 he went to the Villa Lounge in Brooklyn, New York to have a drink; that he brought no heroin with him; that he did not see Beltempo and Cuomo at the Villa Lounge. The jury obviously didn't believe him since they convicted all defendants on all counts.

In Madonia's affidavit attached in support of this motion, he now swears that narcotics agents seized his car; that on July 1, 1969 he brought two kilos of heroin to the Villa Lounge; that

he saw Beltempo and Cuomo there and that he delivered the heroin to Beltempo.

Obviously, Madonia is under tremendous pressure to exculpate the appellants Mele and Coniglio even to the extent of incriminating himself and appellant Beltempo.

Your deponent based on his own knowledge of the facts of the case and upon information and belief after consulting with agents assigned to the investigation, submits that no credible and relevant evidence has been offered by the appellants to support their motion for a new trial.

Wherefore, the government requests that the motion to remand this case to the District Court be denied.

> Robert A. Morse
> United States Attorney
> Eastern District of New York

By: Joseph F. Lynch
    Special Attorney
    Organized Crime Section

Sworn to before me this
    day of August, 1971.

. . . . . . . . . . . . . . . . . . . . .

## APPENDIX B

## MEMORANDUM FOR THE UNITED STATES IN REPLY TO APPELLANTS SUPPLEMENTAL BRIEF

Submitted November 18, 1971

---

Appellants, by their supplemental brief, have requested a remand to the district court on the basis of the post-trial perjury indictment of the government witness, O'Brien and the unsworn affidavit of the deceased co-defendant below, Madonia. In this connection we deem it our duty to disclose the fact that, since oral argument on October 14, 1971 we have discovered that the deceased co-defendant Madonia had had contacts with the Bureau of Narcotics and Dangerous Drugs.

Several days prior to June 30, 1969 when the meeting at the Pussy Cat Lounge took place, Madonia was caught by federal narcotics agents in possession of a small quantity of heroin. He offered to provide the agents with information concerning an imminent, large heroin shipment if they would keep the arrest quiet, because the heroin in his possession had been taken from a larger supply belonging to Mele which Madonia had been keeping as a "stash man." The narcotics agents contacted the Justice Department organized crime task force attorney in-charge who agreed to postpone Madonia's processing and arraignment in hopes of stopping the large shipment of heroin. Madonia subsequently reported to narcotics agent Vecchione that he was to attend a meeting on June 30, 1969 with Mele and would inform the agents of what was discussed.

Narcotics agents O'Brien and Maltz, who were not known to Madonia, were assigned to cover the meeting. On June 30, 1969, the two agents followed Mele to the Pussy Cat Lounge where they surveilled the meeting and overheard the statements by Mele, to which they testified at the trial. The following day, Madonia reported to Vecchione that he had met Mele at the Pussy Cat Lounge, but that no narcotics had been discussed. After Beltempo and Cuomo and the others were arrested on July 1, 1969 following the heroin transfer, Madonia was arrested by narcotics agents at his daughter's apartment in Staten Island. He turned over to the narcotics agents the 22 kilos of heroin hidden in his daughter's apartment.

The narcotics agents remained in contact with Madonia and in September, 1969, Madonia was officially listed as a registered informer. He provided the agents with some information concern-

ing other narcotics transactions, but no useful information was developed from Madonia's contacts. He provided information until about December, 1970, and received about $700 over this period of time. After his conviction in March, 1971, Madonia was officially dropped as an informer in April, 1971. During this time Madonia gave no information concerning the charges against Mele, Cuomo, Beltempo, Coniglio and himself in this case. Madonia also declined a request, transmitted to him through agent Vecchione, to testify as a government witness in this trial.

At the trial, Madonia testified as a witness for appellants Mele and Coniglio and said that he had been at the Pussy Cat Lounge on June 30, 1969, with Mele, Coniglio and another man, but that no narcotics were discussed. The prosecutor believed disclosure of Madonia's contacts with the narcotics agents, which Madonia chose not to reveal although he was manifestly cooperating with the defendants, would result in Madonia being killed. He therefore did not disclose this information at trial.

John J. Robinson

Attorney

United States Department of Justice, Washington, D. C. 20530.

November, 1971

---

CERTIFICATE OF SERVICE

I, John J. Robinson, hereby certify that two copies of the foregoing memorandum were served on counsel for appellants this date, by mailing postage prepaid to:

Jerome Lewis
250 Broadway,
New York, New York 10007

Joseph I. Stone
277 Broadway,
New York, New York

. . . . . . . . . . . . . . . . . . . .
John J. Robinson

Dated this 18 day of November, 1971.