STATE OF NEW JERSEY, PLAINTIFF, v.
EUGENE MILLER, DEFENDANT.

Superior Court of New Jersey
Law Division (Criminal)

Decided September 1, 1976.

■■■■■

*Mr. Paul Chaiet,* Assistant Monmouth County Prosecutor, for the State.

*Mr. James Fagen* for defendant.

ARNONE, J. S. C. The resolution of this matter, defendant's motion for a new trial, requires an examination of the recent mandate of the Supreme Court in *State v. Carter,* 69 *N. J.* 420 (1976).

Defendant was indicted, along with another defendant severed for trial, as a result of an alleged robbery and shooting at the Asbury Park Youth Center on February 13, 1976. Specifically, defendant was charged as follows:

Count 1—Conspiracy to rob one Nellie Martelli;

Count 2—Robbery of Nellie Martelli;

Count 3—Armed feature;

Count 4—Assault with intent to kill Thomas Barrett;

Count 5—Assault and battery on Thomas Barrett, who was serving as a police officer in the performance of his duties;

Count 6—Carrying a pistol without a permit.

At the trial Nellie Martelli, who was the owner of Asbury Park Youth Center, identified defendant as the man who had held a gun on her and had robbed the store. The robbery had taken about five minutes. The witness described the robber as a black male, about 5'10", who was wearing a small knit hat and a small check coat. The witness also saw the robber stuff the money taken into a brown shopping bag. As the robbers left the store the witness saw a policeman and screamed for help.

That policeman was Officer Morales, who identified Miller as the man he saw running from the Youth Center. Morales gave chase, along with fellow officer Barrett. Barrett caught one of the suspects and struggled with him. During the struggle Barrett was shot in the stomach. Barrett identified the person who shot him as Eugene Miller, the defendant.

Mary Shea was working at the Youth Center on February 13 and she testified that Miller looked like one of the robbers.

Miller was arrested on the same day by Officer Jones of Asbury Park, who had known Miller since he was a boy. Upon his arrest Miller had a pistol with one cartridge expended. Ballistics revealed the gun to be the one used to shoot Officer Barrett.

After his arrest Miller confessed to the shooting of Barrett. After conducting a full *Miranda* hearing, the confession was allowed into evidence.

The State also called Brunius Joyner, who was standing nearby as defendant was being chased by Officer Barrett. Joyner identified Miller and the coat he was wearing, and stated he saw Miller shoot Officer Barrett. Other witnesses also identified the coat.

The defense called no witnesses. On the basis of what was before them, the jury convicted defendant on all six counts of the indictment.

Approximately two weeks after the trial, and while defendant's new trial motion was pending, the assistant prosecutor who tried the case learned, from reading the newspaper, that Brunius Joyner had been indicted by the Monmouth County grand jury on a kidnapping charge. Checking the records of the prosecutor's office it was learned that the indictment had been returned approximately one month prior to the Miller trial.

According to the assistant prosecutor's affidavit, which appears undisputed, the matter of pending charges had been discussed with Joyner prior to trial and Joyner had indicated that he had an outstanding charge in Neptune. No promises of any kind were made to Joyner regarding his testi-

mony in the Miller matter. Full discovery had been given by the prosecutor's office, including a copy of Joyner's original statement to the Asbury Park police immediately after the February 13 incident. The crime for which Joyner was indicted had allegedly occurred some three months prior to February 13. The matter of the pending charge was not made known to defendant's attorney during discovery or at any time prior to the trial.

After all parties, including the court, were advised of the indictment, the matter was joined with the new trial motion already pending.

Succinctly stated, the issue before the court is whether the nondisclosure of the Joyner indictment by the prosecutor's office denied defendant of due process of law, thus requiring a new trial, principally under the rationale of *State v. Carter, supra,* and the cases cited therein.

In determining this issue the court must start with the basic proposition that if defense counsel had known of Joyner's indictment, he would have been permitted to cross-examine on it, not only as to possible deals with the State, but also on any favorable expectations Joyner might have entertained. See *State v. Mathis,* 47 *N. J.* 455, 468 (1966); *State v. Sullivan,* 43 *N. J.* 209, 235–36 (1964); *State v. Curcio,* 23 *N. J.* 521, 527 (1957); *State v. Furey,* 128 *N. J. Super.* 12, 22–23 (App. Div. 1974). *Cf. State v Vaccaro,* 142 *N. J. Super.* 167, 361 *A.* 2d 47 (App. Div. 1976). Such cross-examination would certainly have had the possibility of affecting Joyner's credibility.

The natural starting place for the due process question appears to be *Brady v. Maryland,* 373 *U. S.* 83, 83 *S. Ct.* 1194, 10 *L. Ed.* 2d 215 (1963). In *Brady* the court stated that the failure to disclose evidence, regardless of the good faith of the prosecutor, "violates due process where the evidence is material either to guilt or to punishment." 373 *U. S.* at 87, 83 *S. Ct.* at 1196–97. Thus, the standard under *Brady* was materiality, interpreted by some courts which followed as being a question of whether the nondisclosed evidence could

" 'in any reasonable likelihood have affected the judgment of the jury.' " *Giglio v. United States*, 405 *U. S.* 150, 154, 92 *S. Ct.* 763, 766, 31 *L. Ed.* 2d 104 (1972) (quoting from *Napue v. Illinois*, 360 *U. S.* 264, 271, 79 *S. Ct.* 1173, 1178, 3 *L. Ed.* 2d 1217 (1959)). See also, *United States v. Mele*, 462 *F.* 2d 918, 924 (2 Cir. 1972).

In New Jersey the recognition of the *Brady* principle was included in the proposed discovery rules for the criminal courts in 1967. See *Report of N. J. Supreme Court's Special Committee on Discovery in Criminal Cases*, 90 *N. J. L. J.* 209, 215 (1967). The *Brady* provision was not adopted. See "New Rules and Amendments," *R.R.* 3:5–11(a), 90 *N. J. L. J.* 649, 657 (1967). It has not been adopted under the discovery rules, even up to the present, on the theory that it is unnecessary because the prosecutor's duty to disclose such information is "absolute." See *R.* 3:13–3(a) and Pressler comment.

As noted *supra*, the most recent pronouncement on the New Jersey standard of materiality came in *State v. Carter, supra*. There the court stated:

The State's obligation to disclose to defense counsel information it possesses or materials in its files is not limited to evidence that affirmatively tends to establish a defendant's innocence but would include any information material and favorable to a defendant's cause *even where the evidence concerns only the credibility of a State's witness.* [69 *N. J.* at 433; emphasis added]

Under *Carter* a deviation from this standard apparently results *per se* in a denial of due process, so long as the evidence is material. *Id.* at 432–433. Thus, since the evidence herein of Joyner's indictment was not disclosed and was material as it affected credibility, it would facially seem that the broad general language of *Carter* would mandate a new trial.

█ It must be remembered, however, that *Carter* was decided under the federal constitutional notions of due process as expressed in the line of cases beginning with *Brady*. See 69 *N. J.* at 432–433. As a result, any later decisions of the

United States Supreme Court interpreting *Brady* in a manner not discussed in *Carter* would be controlling, for the states are not free to interpret the Federal Constitution more strictly than that court. See *Oregon v. Haas,* 420 *U. S.* 714, 95 *S. Ct.* 1215, 1219, 43 *L. Ed.* 2d 570 (1975).

■ Such an interpretation of *Brady* was made subsequent to *Carter in United States v. Agurs,* —— *U. S.* ——, 96 *S. Ct.* 2392, 49 *L. Ed.* 2d 342 (1976). The court there indicated that *Brady* applies in three different situations, with three different results as to the standard of "materiality" required for a new trial. In the first situation the State knowingly offers perjured testimony. In such a case the standard of materiality is strict because the "testimony is fundamentally unfair" and because it involves "a corruption of the truth-seeking function of the trial process." —— *U. S.* at ——, 96 *S. Ct.* at 2397. In these cases the standard becomes whether "there is any reasonable likelihood that the false testimony could have affected the judgment of the jury." *Id.* Compare *Giglio v. United States, supra; Napue v. Illinois, supra.*[1] No such problem exists in the instant matter.

The second situation involves an unresponded-to request for specific exculpatory information. This situation represents the very facts of *Brady.* A failure to respond by the prosecution in such a case "is seldom, if ever, excusable." —— *U. S.* at ——, 96 *S. Ct.* at 2398–99. That situation is likewise not present here.

The instant matter is similar to the third situation discussed by the court in *Agurs,* where either no request is made or where the request is so unspecific as to amount to no request. *Id.* —— *U. S.* at ——, 96 *S. Ct.* at 2399. In this situation the standard of "materiality" is somewhat less strict and imposes "a higher burden on the defendant." *Id.* —— *U. S.* at ——, 96 *S. Ct.* at 2401. As the court stated:

---

[1] Both of these cases were cited by the *Agurs* court as examples of this first situation. See —— *U. S.* at ——, 96 *S. Ct.* at 2397, n. 9.

The proper standard of materiality must reflect our overriding concern with the justice of the finding of guilt. Such a finding is permissible only if supported by evidence establishing guilt beyond a reasonable doubt. It necessarily follows that if the omitted evidence creates a reasonable doubt that did not otherwise exist, constitutional error has been committed. This means that the omission must be evaluated in the context of the entire record. If there is no reasonable doubt about guilt whether or not the additional evidence is considered, there is no justification for a new trial. On the other hand, if the verdict is already of questionable validity, additional evidence of relatively minor importance might be sufficient to create a reasonable doubt. [—— U. S. at ——, 96 S. Ct. at 2401-02; footnotes omitted]

In the instant matter Nellie Martelli, the actual victim of the robbery, identified defendant. She also said that the money was put into a brown paper bag. Mary Shea, who was working at the Youth Center, said that defendant looked like the robber. Officer Morales identified defendant as the man seen running from the store. Officer Barrett identified defendant as the man who shot him. The coat was recovered and identified by Officers Morales and Barrett as the one defendant was wearing. Defendant was seen carrying a brown shopping bag and was arrested in possession of a gun which ballistics showed to be the weapon which wounded Officer Barrett. At the police station defendant confessed to the shooting of Barrett. None of this evidence is being attacked now as being improper.

What is challenged is the testimony of Brunius Joyner, who said he saw defendant shoot Officer Barrett. Even if Joyner were lying in expectation of favorable treatment by the State, the remaining evidence which was before the jury was so great as to preclude any reasonable doubt about the defendants' guilt. Thus, evaluating the nondisclosure by the State "in the context of the entire record," defendant's motion for a new trial must be denied. See *United States v. Agurs, supra,* —— U. S. at ——, 96 S. Ct. at 2402.