UNITED STATES of America,
Plaintiff-Appellee,

v.

John HARO, Defendant-Appellant.

Nos. 76–1907 and 77–1263.

United States Court of Appeals,
Tenth Circuit.

Argued and Submitted Jan. 27, 1978.

Decided March 30, 1978.

Rehearing Denied April 28, 1978.

Harold A. Haddon, Denver, Colo. (Bryan Morgan, Denver, Colo., on the brief), of Haddon, Morgan & Shelley, Denver, Colo., for defendant-appellant.

Richard S. Vermeire, Asst. U. S. Atty., Denver, Colo. (James L. Treece, U. S. Atty., Cathlin Donnell, U. S. Atty. (Interim), Denver, Colo., on the brief), for plaintiff-appellee.

Before McWILLIAMS, BARRETT and McKAY, Circuit Judges.

BARRETT, Circuit Judge.

John Haro (Haro) appeals his jury convictions on a four-count indictment wherein he was charged with possessing unregistered firearms or destructive devices in violation of 26 U.S.C.A. §§ 5861(d) and 5871. The respective counts, relating to each of the four destructive devices (grenades), read as follows:

That on or about September 13, 1975, at Denver in the State and District of Colorado, JOHN HARO did knowingly and unlawfully possess a firearm as defined by Title 26, United States Code, Section 5845, to-wit, one destructive device more completely described as a dark metal practice fragmentation grenade filled with approximately 1½ to 2 ounces of an explosive powder and containing a non-electric blasting cap ignition system, bearing no serial number, which firearm was not registered to the said JOHN HARO in the National Firearms Registration and Transfer Record, all in violation of Title 26, United States Code, Sections 5861(d) and 5871.

The Government's case was primarily predicated on the testimony of certain witnesses, including:

Joseph Cordova, who testified that: on September 12–13, 1975 he was working as a paid and confidential informant for the federal government; on September 13, 1975, while acting in an undercover capacity as a confidential informant he went to Haro's service station and obtained from Haro four grenades; Haro gave him the grenades by taking them out of a box behind the desk at his service station, and putting them in a sack; the grenades were transported in his car to a prearranged location where they were turned over to law enforcement officials; during the time he drove to Haro's station, received the grenades and delivered them to the law enforcement officials, he was accompanied by Agent Valadez, an undercover agent for the Bureau of Alcohol, Tobacco and Firearms.

Agent Valadez, who testified that: on September 13, 1975 he was working in an undercover capacity and he accompanied Cordova to Haro's service station; prior to going to Haro's station, he examined Cordova and his automobile to make cer-

tain there were no firearms or explosives in his possession; he checked Cordova and his automobile to "maintain good custody of any evidence obtained while you were out"; he heard Haro say "Let me see if I can find a plastic bag or something"; he observed Haro "doing something behind his desk" and thereafter stand up and hand Cordova "the plastic bag which now contains something heavy"; the plastic bag was placed in the trunk of Cordova's car, after which he (Valadez) closed the trunk; the trunk was not opened nor did he and Cordova stop after they left Haro's station until they met with law enforcement officials at a prearranged site; upon arrival at the prearranged site other officers removed the sack of grenades from Cordova's trunk.

Agent Elkin of the Bureau of Alcohol, Tobacco and Firearms, who testified that: he met Cordova and Valadez at a prearranged site on September 13, 1975 after they had left Haro's station; at the site he directed Cordova to open the trunk of his car, after which he took the plastic bag out of the trunk and placed it in the trunk of his automobile; he later placed the sack in the trunk of a Denver Police car occupied by Officers Erhart and Rollin of the Denver Police Department Bomb Squad and followed the car to Mile High Stadium.

Agent Hupp of the Bureau of Alcohol, Tobacco and Firearms, who testified that: he was at Mile High Stadium on September 13, 1975 where he examined four grenades contained in a plastic sack and thereafter dismantled one grenade and detonated another in the "bomb truck bucket."

Detective Erhart of the Denver Police Department Bomb Squad, who testified that: he met Agent Elkin on September 13, 1975 at a prearranged site and observed four grenades in a plastic sack in the trunk of his car; he took custody of the sack of grenades, locked them in the trunk of his car and transported them to Mile High Stadium where he and Agent Hupp disarmed one grenade, detonated

one grenade, that he thereafter disassembled the other two grenades; he turned over all the component parts of the grenades to Agent Larry Thomason.

Agent Thomason of the Bureau of Alcohol, Tobacco and Firearms, who testified that: on September 13, 1975 he followed, continuously, Cordova's car from Haro's station to a prearranged site; thereafter he observed the examination of the grenades at Mile High Stadium by Detective Erhart and Agent Nupp; at the Stadium he took custody of the plastic bag which contained the grenades.

Agent Nels Nelson of the Bureau of Alcohol, Tobacco and Firearms, who testified and identified a series of photographs he took on September 13, 1975 at Mile High Stadium of the four grenades which were being examined, detonated and disassembled.

At the conclusion of the Government's case-in-chief the parties stipulated to the chain of custody of the four grenades, commencing at a prearranged site, to the possession of law enforcement officers for examination purposes, and finally to the courtroom for trial identification. The parties further stipulated that the devices were destructive devices as described in the indictment and subject to the applicable statutes.

After the Government rested Haro moved for dismissal. He alleged that the Government had failed to prove that he had knowingly possessed any firearm of such type as would alert him of the need for registration.

Haro's defense relied primarily on his testimony and that of other witnesses, including:

Joseph Gonzales, a part-time employee of Haro, who testified that: he was working in the station on September 13, 1975 at which time an informal inventory was taken and no explosive devices were observed; the desk at the station was located so that virtually anyone had free access to it; Cordova's reputation in the community for truth and veracity was no good.

Romero Rodriguez, who testified that: he sold service station supplies to Haro; he had access to the station including behind the desk area; he was around the desk area on September 10 and 11 or 12, 1975, and did not see any grenades or destructive devices.

Detective J. C. Tyus of the Denver Police Department, who testified that with respect to the investigation of this case he told Cordova that his (Cordova's) remuneration would be in thousands and thousands of dollars and would involve a new life.

Haro, who testified that he had seen Cordova on September 12 and 13, 1975, but that they did not converse about grenades and destructive devices, and that he did not possess or give Cordova any grenades or destructive devices on September 13, 1975.

On appeal Haro contends that the trial court erred in (1) denying his statutory and constitutional challenges to the composition of the grand and petit juries; (2) failing to set aside the critical stipulation regarding destructive devices; (3) preventing adequate cross-examination of the Government's key witness; and (4) in refusing his tendered instruction regarding Cordova's false testimony. In a consolidated appeal Haro also challenges the trial court's determinations that defense counsel had knowledge of certain alleged "new facts" when the instant case was tried and that the "new facts" did not, in any event, constitute evidence of sufficient significance to warrant a new trial.

## I.

■ Haro contends that the trial court erred in denying his statutory and constitutional challenges to the composition of the grand and petit juries. In denying these challenges the trial court noted:

. . . The first Petit Jury panel under the new plan of such implementation was summoned on the 3rd of November, 1975, and a copy of the new plan was sent to the United States Attorney for the District of Colorado and to the Attorney

General of the United States of America and was also publicly announced on the 20th of November, 1975, and we have reviewed the cover letters reflecting the circulation and the submission as required by law of the new plan. The present Petit Jury was empaneled on the 15th of December, 1975, and defendant's motion challenging the jury selection procedure was filed on the 13th of January as the Court has announced at 4:49. We have analyzed the brief of the defendant in this case and also the brief of the government and reviewed the applicable litigation, the legislation found at 28 United States Code 1861 dealing with juries and also we have proceeded as the Court has announced with its own research. We are satisfied that the Defendant's Motion to Dismiss the Indictment or Quash the Petit Jury Array is not well taken and in all particulars is denied. The Court would care to point out that the Grand Jury panel that the defendant was indicted by has previously been challenged unsuccessfully in this District in the *Test* —supplemental *Test* case following the mandate by the Supreme Court and also the *Bishop* case which has been cited by the Court.

[R., Suppl. Vol. II, at 13–14.]

We hold the trial court did not err in denying Haro's challenge, particularly when, as here, the decisions relied upon by the trial court including *United States v. Test*, 550 F.2d 577 (10th Cir. 1976), were affirmed on appeal.

## II.

Haro contends that the trial court erred in failing to set aside the critical stipulation regarding destructive devices.

During trial, defense counsel stipulated that, as a matter of law, all four grenades were destructive devices included in the definition of a firearm under the applicable statutes. Subsequent to trial, Haro filed a motion to dismiss, or in the alternative for a new trial, and that he be afforded relief from the stipulation. Haro argued that the stipulation was entered into at a time when

his counsel was unaware that the Government's expert witness had prepared one set of exemplar devices to be utilized in both the present case and another unrelated case.

In denying the motion the trial court found, after a hearing involving testimony from the Government's witness, that: the witness' failure to disclose that the exemplars were being prepared for two unrelated cases was irrelevant; the Government's failure to disclose the nature of the case pending in Kansas was unknowing and unintentional; and that in view of the additional trial evidence, there was no showing that relief from the stipulation would have led to a different result at trial. The trial court also found that even had Haro known that one set of exemplar devices was being prepared for both cases, it would not have affected the stipulation herein, nor would it have been exculpatory or have assisted in the defense at trial.

Haro contends that he was completely unaware that the exemplars were not prepared solely for use as evidence in the instant case; that the stipulation entered into by defense counsel constituted the only proof with respect to the destructive character of three of the grenades; and that his counsel would not have entered into the stipulation had he known of the basis that the witness prepared the exemplar devices.

We hold that the non-disclosure by the Government's witness that he was preparing one set of exemplar devices for use in two unrelated cases did not give rise to reversible error. Initially, we observe that Haro was convicted on all four counts and that the sentences were ordered to be served concurrently. Furthermore, one of the grenades was detonated, at which time it was found to be a high quality destructive device; the four grenades were found to be identical in all pertinent parts, the disassembled grenades were "essentially full of the powder and the bolts"; and the exemplar devices constructed for this case and the unrelated Kansas case were "identical in all pertinent respects to those submitted as evidence."

Haro's contention that the Government engaged in prosecutorial misconduct in allowing one set of exemplar devices to be prepared for two unrelated cases is without merit. The Government did not know, until completion of the trial in the instant case, that its witness had made one set of exemplar devices for two cases. Even assuming, *arguendo*, that the Government acted improperly, Haro has failed to establish that his knowledge of the fact that one set of exemplar devices was being prepared by the Government for two unrelated trials would have led to a different result on retrial. In *United States v. Grismore*, 546 F.2d 844 (10th Cir. 1976), we observed:

> If a defendant can show that suppression or tampering with evidence was deliberately done by the prosecution, the court need then only consider if the evidence was material and determine whether it could in any reasonable likelihood have led to a different result on retrial. *United States v. Mele*, 462 F.2d 918 (2d Cir. 1972). The initial *burden is, however, on the defendant to show that the evidence was tampered with. United States v. Mele, supra.* The presumption is that an official has not tampered with the evidence. *Brewer v. United States*, 353 F.2d 260 (8th Cir. 1965); *Gallego v. United States*, 276 F.2d 914 (9th Cir. 1960). (Emphasis supplied.)

546 F.2d, at 850.

This standard is particularly appropriate here inasmuch as the evidence is overwhelming that the grenades were destructive devices as defined under the applicable statutes. One alleging prejudice must demonstrate its damaging effect. Haro's assertions do little more than lead to guesswork and conjecture. Such is not sufficient to raise a reasonable inference because it lacks a foundation in fact.

### III.

Haro contends the trial court erred in preventing adequate cross-examination of the Government's key witness, Cordova. Haro argues that: (a) the denial of a psychiatric examination was error; (b) the trial

court's refusal to examine the case file on a pending felony charge against the defendant was error; and (c) it was error to permit Cordova to invoke the Fifth Amendment as to certain criminal acts after he waived his rights by testifying about those acts.

### (a)

■ Cordova was convicted of a felony in 1969. At that time, upon the advice of counsel, he pled not guilty by reason of insanity. Under these circumstances, Haro contends that the trial court erred in denying his request for a current psychiatric examination of Cordova. Haro argues that an examination would aid the court in determining Cordova's competency and would be "highly relevant to the matter of the witness credibility." We hold that the trial court did not err in refusing to order a current psychiatric examination for Cordova.

Prior to testifying at trial, Cordova was questioned extensively *in camera* by the trial court, and at the conclusion of the questioning the trial court found, *inter alia* :

THE COURT: The Court has reviewed the provisions of Rule 104 of the Federal Rules of Evidence and Rule 601 and the Court in regard to 104(a) expressly finds that this witness is qualified to be a witness, that he has competency. We further find that under Rule 601 that this witness—there has been nothing to show that this witness under 601 has any impediment to testifying. We've also queried this witness in regard to 603 in regard to the understanding of this witness as to the solemnity of the oath. We are satisfied that from the answers given by this witness that the oath would in the words of 603, awaken his conscience and enforce his mind and duty to testify truthfully.

We further find that this witness is competent. He has the capacity to observe. He has the capacity of recognition. He has the capacity of communication. We have found that that witness is competent to testify.

We further find that he has the essential intelligence to testify. We have found that he has sufficient capacity to observe, to recollect and to communicate with others as to the matters that he will be called upon to testify in this case. Further, that he understands the sanctity of the oath. We are satisfied that from our inquiry of him, that he has sufficient accuracy of testimony to make the duration correspond to the knowledge and his recollections.
[R., Vol. I, at 48–49.]

Thereafter Haro was granted considerable latitude in his cross-examination of Cordova relative to his 1969 conviction:

Q. Mr. Cordova, I believe you stated on direct examination that you have a prior felony conviction; isn't that true?
A. Yes.
Q. And when was that sustained?
A. When did I get convicted?
Q. Yes.
A. In 1969.
Q. Is that also the time you entered a not guilty by reason of insanity plea?
A. Yes.
Q. And isn't that also the time that you were suffering from amnesia?
A. No.
Q. Have you ever suffered from amnesia?
A. No.
Q. Did you ever indicate to a doctor that you had suffered from amnesia?
A. No.
Q. Did you ever indicate to a doctor that you were drinking excessively?
A. I don't remember.
Q. Specifically regarding 1969, pursuant to your entry of a not guilty by reason of insanity pleas, do you recall being examined by a doctor?
A. Yes.
Q. Do you recall the doctor's name?
A. No.
Q. Or doctors'?
A. No, I don't recall his name.
Q. And you did not, is it your testimony, you did not recall being asked or

stating that you suffered from amnesia and excessive drinking?

A. No, I don't recall.

(R., Vol. II, at 156–157.]

The trial court properly and adequately questioned Cordova in assessing his competency. Thereafter, Haro was permitted to cross-examine relative to Cordova's 1969 plea. Evidence of an incapacity was not established. *Sinclair v. Turner*, 447 F.2d 1158 (10th Cir. 1971), *cert. denied*, 405 U.S. 1048, 92 S.Ct. 1329, 31 L.Ed.2d 590 (1972). Accordingly, no error was committed in refusing Haro's request for a psychiatric examination of Cordova. In *United States v. Spoonhunter*, 476 F.2d 1050 (10th Cir. 1973), we stated:

. . . In federal prosecutions the admissibility of evidence and the determination of competency of witnesses is dictated by federal law, as reason and experience may dictate, and not by state law. *Funk v. United States*, 290 U.S. 371, 54 S.Ct. 212, 78 L.Ed. 369 (1933); *Olmstead v. United States*, 277 U.S. 438, 48 S.Ct. 564, 72 L.Ed. 944 (1928); *Rogers v. United States*, 369 F.2d 944 (10th Cir. 1966), cert. denied 388 U.S. 922, 87 S.Ct. 2125, 18 L.Ed.2d 1371 (1967); Rule 26, Fed.R. Crim.P., 18 U.S.C.A. In any event, we find no inconsistency in the cited statute and our rule: the capacity of a person offered as a witness is presumed, and in order to exclude a witness on the ground of mental incapacity, the existence of the incapacity must be made to appear. *Sinclair v. Turner*, 447 F.2d 1158 (10th Cir. 1971), cert. denied 405 U.S. 1048, 92 S.Ct. 1329, 31 L.Ed.2d 590 (1972).

476 F.2d, at 1054.

(b)

Haro argues that "[t]he refusal of the court to examine the case file on a pending felony charge against the defendant was error." (Although Haro's brief repeatedly refers to "the defendant," we assume this was in error and that the argument is directed to Cordova.)

Haro subpoenaed the state prosecutor's file and requested that the trial court re-view it *in camera* to determine "whether or not such evidence, or leads to matters which would have been helpful concerning cross-examination of Cordova." The trial court declined to review the file. Haro contends that this was erroneous, particularly here "where there are the strongest possible suggestions of bias or motive for the informant's testimony in terms of leniency regarding criminal prosecutions pending against the informant himself."

The right to effectively cross-examine is well established. *Alford v. United States*, 282 U.S. 687, 51 S.Ct. 218, 75 L.Ed. 624 (1931). However, the right to cross-examine is not carte blanche, and limitations on cross-examination give rise to reversible error only when the limitations deny the examiner the opportunity to effectively cross-examine in violation of rights secured by the Sixth Amendment. *Smith v. Illinois*, 390 U.S. 129, 88 S.Ct. 748, 19 L.Ed.2d 956 (1968). Cross-examination pertinent to the credibility of a witness should be given the largest possible scope. Even so, the scope of cross-examination is within the trial court's sound discretion. In *Abeyta v. United States*, 368 F.2d 544 (10th Cir. 1966), we stated:

. . . On cross-examination Kingsbury testified that he left the Albuquerque Police Department in March of 1961 for a better job. The court refused to permit further questioning as to Kingsbury's reason for leaving that employment. Romero's counsel then offered to prove that Kingsbury had been requested to resign from the Albuquerque Police Department because of insubordination, in that "he was a little bit too interested in his work. He went a little too far in his work." Although cross-examination pertinent to the credibility of a witness and for the development of facts which may tend to show bias or prejudice should be given the "largest possible scope", nevertheless, as we said in *Foster v. United States*, 10 Cir., 282 F.2d 222, 224: "the trial court is the governor of the trial with the duty to assure its proper conduct and the limit of cross-examination neces-

sarily within its discretion." See, also, *Jennings v. United States*, 10 Cir., 364 F.2d 513. In sustaining the objection to this line of questioning, we find no abuse of discretion.

368 F.2d, at 545.

Applying these standards to the case at bar, we hold that the trial court did not err in declining to review the file of state charges pending against Cordova at the time of his trial testimony. Haro apparently believed that this information would have "painted" Cordova as an "untrustworthy rascal" whose credibility was extremely suspect. The record reflects that Haro effectively accomplished this objective by means of vigorous cross-examination. Haro's extensive cross-examination apprised the jury that Cordova was convicted of a felony robbery in 1969, that he had five counts of felony theft outstanding, that he had recently shot a man, and that he had received deferred prosecutions and monetary payments by testifying for law enforcement agencies as an informant. Under these circumstances, the trial court's refusal to permit review of the state file was not error. This is particularly true when, as here, the evidence against Haro was so overwhelming that the testimony of Cordova was little more than cumulative.

(c)

Haro contends it was error to allow Cordova "to take the Fifth Amendment as to certain crimes after he waived his rights by testifying about those matters." The following colloquy gave rise to this contention:

Q. By the way, regarding the burglary that you provided Detective Cinquanta information for, the one at the beginning of May, how were you able to provide that information?

A. What do you mean, sir?

Q. How did you have information regarding that burglary?

A. I observed the information.

Q. You observed the information. Did you observe the burglary?

A. Yes.

Q. Are you saying you participated in the burglary?

MR. KOBAYASHI: Objection, Your Honor. That goes to the matter we discussed at the bench.

THE COURT: Overruled. Let's go ahead, please.

Q. (By Mr. Marks) Did you participate, is that how you had the information?

A. At this time I decline to answer that on the grounds that I would like to assert my Fifth Amendment until I talk to my lawyer.

THE COURT: Let's go into another area.

Let's mark this place, Mrs. Carpenter. [R., Vol. I, at 98–99.]

In later ruling on Cordova's claim of his Fifth Amendment privilege, the trial court said:

THE COURT: The Court is prepared to rule at this time. The Court will sustain the claim of privilege. The Court finds that this claim is substantial and real and not merely trifling, nor based on imaginary hazard of incrimination. The Court is satisfied that there are appreciable risks of incrimination. The testimony even at this juncture showed the presence through this witness that the location—at the location and potentially does involve this witness. The alleged incident is within the Statute of Limitation. We expressly find at this point that even taking the testimony in the best light to the defendant for the purposes of this motion that there has been no waiver of self-incrimination. We are of the view that the waiver must be clear and unequivocal. It is not so here. We are further of the view that the answering of this question, very much that the claim of privilege has been firmly and satisfactorily established in the Court's mind; that the privilege against self-incrimination must be interpreted liberally in favor of the witness and intended to secure. *Hoffman vs. U. S.*, 341 U.S. 479 [71 S.Ct. 814, 95 L.Ed. 1118]. This same case states that the privilege extended "not only to answers that would in themselves

support a conviction . . ., but also to those which would furnish a link in the chain of evidence needed to prosecute the claimant for a crime."

We are further satisfied that this witness cannot be compelled to give testimony in federal court which might subject him to prosecution in a state court and the corollary is true. I believe that this has been somewhat expounded in the case of *Malloy vs. Hogan*, 377 U.S. 1 [84 S.Ct. 1489, 12 L.Ed.2d 653] and 378 U.S. 52 [84 S.Ct. 1594, 12 L.Ed.2d 678], the case of *Murphy vs. Waterfront.* We are satisfied that at this point, there has been no waiver and that the Court upholds the claim of privilege as it relates to alleged incidents that took place in May of 1975. [R., Vol. I, at 118–119.]

We hold that the trial court did not err in so ruling. We believe it particularly noteworthy that Cordova stated simply that he *observed* the burglary. He did not state that he *participated* in it. We will not interpret the "observation" of a crime as an admission of *participating* in a crime giving rise to the waiver of one's Fifth Amendment rights. Cordova was entitled to assert his privilege. It had not been preceded by an admission or a related waiver of the privilege against self-incrimination. In our view further cross-examination on this point would simply have served to further attack Cordova's credibility which had already been laid bare.

### IV.

We have carefully considered the balance of Haro's allegations of error. We hold that they are individually and collectively without merit.

WE AFFIRM.