UNITED STATES of America, Appellee,

v.

Jose L. M. PARDO et al., Appellant.

UNITED STATES of America

v.

Cecil P. TATE, Appellant.

UNITED STATES of America

v.

Sixto R. MENDOZA, Appellant.

UNITED STATES of America

v.

Paul A. GOODWIN, Appellant.

Nos. 79–1831, 79–1836, 79–1895 and 79–1896.

United States Court of Appeals, District of Columbia Circuit.

Argued June 16, 1980.

Decided Aug. 11, 1980.

Allan Palmer, Washington, D. C. (Appointed by this Court), Steffen Grae (Appointed by this Court), Peter J. Kahn, Washington, D. C., with whom Joel DuBoff, Washington, D. C. (Appointed by this Court) was on brief, for appellants.

Harold Damelin, Asst. U. S. Atty., Washington, D. C., with whom Charles F. C. Ruff, U. S. Atty., John A. Terry, Barbara E. Liles and Roger M. Adelman, Asst. U. S. Attys., Washington, D. C., were on brief, for appellee.

Before McGOWAN and EDWARDS, Circuit Judges, and KASHIWA,* Judge, United States Court of Claims.

Opinion for the Court filed by Circuit Judge EDWARDS.

* Sitting by designation pursuant to 28 U.S.C. § 293(a) (1976).

EDWARDS, Circuit Judge:

On February 1, 1979, Clifford Corbett, Melvin Bell, Paul Goodwin, Cecil Tate, Sixto Mendoza and Jose Pardo were charged in a two count indictment. Count I charged the defendants with unlawful possession with intent to distribute a controlled substance in violation of 21 U.S.C. § 841(a); Count II charged defendants with unlawful possession of a narcotic drug in violation of 33 D.C.Code § 402. In exchange for a plea of guilty to charges contained in other indictments, the above charges against Clifford Corbett were dropped. The remaining five defendants were found guilty of possession with intent to distribute a controlled substance following a four–day jury trial. Goodwin, Tate, Mendoza and Pardo here appeal that conviction.

Three issues are raised in this appeal. First, appellants claim that the trial judge committed reversible error in sustaining Clifford Corbett's blanket refusal to testify and assertion of the Fifth Amendment privilege against self–incrimination. Second, appellants contend that if Corbett did have a valid Fifth Amendment right, the circumstances of this case required the trial court to compel a grant of immunity to Corbett as a condition for appellants' prosecution. Finally, appellants Mendoza and Pardo claim that the trial judge wrongfully denied their motions for judgment of acquittal at the close of the Government's case.

We hold that Corbett did not have a blanket Fifth Amendment right to refuse to testify, and reverse the convictions of Goodwin and Tate for a new trial if the Government so elects. This ruling does not inure to the benefit of the other appellants, however, because they never sought to obtain the testimony of Corbett at trial. As a result of this ruling regarding Corbett's Fifth Amendment claim, we need not reach the question whether appellants had a Sixth Amendment right to procure the testimony of Corbett through a grant of immunity. We uphold the trial judge's denial of appellant Mendoza's motion for judgment of acquittal at the close of the Government's

case, and therefore affirm his conviction. As to appellant Pardo, however, we rule that the evidence was insufficient to justify submitting the case to the jury, and direct that Pardo's conviction be reversed and the charges against him dismissed.

## I.

We begin with a general outline of the facts. On appeal from conviction, we of course must present the facts in the light most favorable to the Government. *United States v. Barlow*, 470 F.2d 1245, 1250 (D.C. Cir. 1972).

On or about November 18, 1978, Special Agent John W. Lee, of the Drug Enforcement Administration, met Clifford Corbett (Tr. 53).[1] Lee introduced himself as "Johnny" and represented to Corbett that he was in the business and buying and selling narcotics (Tr. 54). On November 21, 1978, and again on November 27, 1978, Lee purchased an ounce of cocaine from Corbett (Tr. 55).

Beginning on December 27, 1978, Agent Lee made arrangements to purchase approximately two pounds of cocaine from Corbett for approximately $40,000 (Tr. 55–56). The events surrounding this transaction eventually led to the indictments involved in this appeal.

On December 29, 1978, Lee received a call from Corbett indicating that Corbett wished to meet with Lee at approximately twelve noon (Tr. 56). Corbett advised Lee that his source was ready to do business. Accompanied by his partner, Special Agent Charles Howard ("Charlie"), Lee met Corbett at the intersection of Connecticut and Florida Avenues and proceeded to Corbett's apartment at 1910 T Street, N.W. (Tr. 58–59).

Soon after the three men entered the apartment, Corbett received a telephone call informing him that his source would arrive in about fifteen minutes (Tr. 59). When the source had not arrived after approximately an hour, Lee and Howard left to take care of "other business" (Tr. 61).[2] Lee told Corbett he would return in forty-five minutes.

Lee returned to the apartment at approximately 4 p. m. (Tr. 62). Agent Howard remained outside in a car. Once inside the apartment, Corbett told Lee that his source would sell a pound of cocaine for $26,500 (Tr. 63). Lee offered to pay no more than $22,000. After allegedly telephoning his source and determining that Lee's price was acceptable, Corbett advised Lee that they would have to go to the place where the cocaine was stashed.[3] Corbett instructed Lee to return to the car and wait for him.

Soon thereafter, Corbett, appellant Paul Goodwin, and a young woman exited the apartment building and entered a nearby parked car (Tr. 64).[4] From the driver's seat, Goodwin motioned for the agents to follow in their own car. Goodwin led the agents to a warehouse on Sligo Mill Road in Washington, D.C. (Tr. 67).

Corbett, Goodwin and Lee got out of the cars and approached the warehouse (Tr. 67).[5] They were admitted to the warehouse by Melvin Bell (Tr. 68).[6] Inside the warehouse, Lee was introduced to appellants Cecil Tate and Sixto Mendoza (Tr. 71).[7] Lee overheard Tate say to Goodwin that he did not want a whole bunch of people up here, and Goodwin responded that "they are all

---

1. Aside from a forensic chemist called to identify the narcotics, Agent Lee was the Government's sole witness at trial. "Tr." refers to the transcript of the trial conducted before the Honorable Aubrey Robinson, District Judge, between June 26 and June 29, 1979.

2. While they were waiting, Corbett showed Lee a small amount of cocaine that Corbett had allegedly gotten from the package Lee was to purchase. A test of the powder with clorox indicated that it was in fact cocaine (Tr. 59–60).

3. Lee testified that Corbett never in fact used the phone (Tr. 63).

4. Lee had never seen Goodwin before (Tr. 65–66).

5. Agent Howard remained in the car.

6. Although a codefendant in this action, Bell is not a party to this appeal.

7. Lee had testified before the grand jury that he did not meet Mendoza until later (Tr. 213–14).

right" (Tr. 72).[8] Tate then scrutinized Lee and Corbett and stated that everything was all right.

After going to the bathroom, Lee was instructed by Bell to join the others on the "mezzanine," an open room built above a lounge next to the front office (Tr. 70, 73). Lee described the mezzanine as up about fifteen to twenty stairs, measuring approximately twelve by fifteen feet (Tr. 70). When Lee reached the mezzanine, appellant Mendoza was standing at the top of the stairs, and behind him was a desk (Tr. 73–74). Behind the desk was appellant Tate and behind Tate was an individual later identified as appellant Jose Pardo (Tr. 74).[9] Corbett and appellant Goodwin were to the right of the desk.

Tate then asked whether Lee wanted to see "the stuff" (Tr. 75). Lee responded in the affirmative, and Tate placed a paper bag containing two plastic bags on the table.[10] Tate said something to the effect of "here's the stuff" (Tr. 75).

Lee then directed a question at Mendoza as to whether the stuff had been tested (Tr. 75). Mendoza responded that it had not been tested (Tr. 75, 216–18). At that point, Lee asked whether anyone had any clorox (Tr. 75). Not finding any, Lee asked Bell to go out to his car to get some clorox out of the trunk. While Bell was away, Lee inspected the powder. Tate advised Lee that everything was okay, that "it was some good stuff" (Tr. 76).

Before Bell returned, Agent Lee signaled to surveillance agents outside the warehouse (Tr. 76). Lee then pulled out his badge and revolver and arrested Corbett, Goodwin, Tate, Mendoza and Pardo (Tr. 77). Bell was arrested downstairs by one of the officers responding to Lee's signal.

On February 1, 1979, Corbett, Goodwin, Tate, Mendoza, Pardo and Bell were indicted by a federal grand jury. Count I charged the defendants with unlawful possession with intent to distribute a controlled substance in violation of 21 U.S.C. § 841(a); Count II charged defendants with unlawful possession of a narcotic drug in violation of 33 D.C.Code § 402. Clifford Corbett was also named in two additional indictments on the basis of the sales of narcotics to Agent Lee on November 21, 1978 and November 27, 1978, and on the basis of narcotics later seized from his apartment on December 29, 1978.[11]

On March 20, 1979, Corbett entered pleas of guilty to one felony count in each of the other two indictments.[12] As part of the plea arrangement with Corbett, the two count indictment in the present case was dismissed, along with three additional counts in one of the other indictments.

A consolidated trial of the remaining defendants was conducted in the courtroom of District Judge Aubrey Robinson beginning on June 26, 1979. On June 29, 1979, a jury found defendants Goodwin, Tate, Bell, Mendoza and Pardo guilty on both counts.[13] Goodwin, Tate, Mendoza and Pardo brought this appeal.

## II.

Appellants first claim that the trial judge committed reversible error in upholding

8. Lee had testified at the preliminary hearing that he could not hear Goodwin's response (Tr. 114–15).

9. Lee had never seen Pardo before (Tr. 74).

10. Lee had testified at the preliminary hearing that the paper bag was already on the desk when he reached the mezzanine (Tr. 127–28). Lee admitted on cross-examination that the plastic bags were never taken out of the paper bag (Tr. 216).

11. The instant indictment against all defendants was numbered 79–73. In Crim.No. 79–72, Corbett was charged with four counts. The first count concerned the sale of cocaine to Lee on November 27, 1978; the remaining counts dealt with narcotics seized from Corbett's apartment on December 29, 1978. In Crim.No. 79–74, Corbett was charged (along with codefendant Lawrence Williams) with one count stemming from the sale of narcotics to Lee on November 21, 1978.

12. These are the first count in 79–72 and the sole count in 79–74.

13. The second count, charging possession of cocaine, was dismissed prior to sentencing as a lesser included offense.

Clifford Corbett's invocation of the Fifth Amendment privilege against self–incrimination and corresponding refusal to testify at the trial of his former codefendants. All four appellants here contend that Corbett did *not* have a Fifth Amendment right to refuse to testify. In addition, appellants vigorously argue that if Corbett did have a Fifth Amendment right, appellants had a Sixth Amendment right to procure his testimony through a grant of immunity to Corbett.

It is critical at the outset to review the circumstances of Corbett's dismissal from this action. In addition to the two count indictment in the present case, Crim.No. 79–73, Corbett was named in a four count indictment in Crim.No. 79–72, and a one count indictment in Crim.No. 79–74.[14] All charges against Corbett involved narcotics. On March 20, 1979, Corbett pled guilty to one count in 79–72 and to the sole count in 79–74. As a part of the plea arrangement with the Government, the three remaining counts of 79–72 and the two counts in the present case 79–73 were dismissed at the time of sentencing.[15]

Prior to trial, appellant Goodwin submitted a "Motion For Compulsory Process and Testimony" (R. 24).[16] The motion requested that Goodwin be allowed to make an *ex parte* proffer as to what he expected Corbett's testimony would be, and that Corbett be questioned *ex parte* as to his anticipated testimony. If the testimony was found to be material and necessary to the defendant, the court was requested to determine whether Corbett would testify without a grant of immunity or, if not, to require the Government to either grant im-

munity to Corbett or dismiss the charges against Goodwin.

Appellant Tate also made a pre–trial motion to secure the testimony of Corbett (R. 27). In support of the motion, Tate submitted an affidavit which declared that Corbett had told Tate, in the presence of Tate's counsel, that Agent Lee was lying in stating that Tate had made certain incriminating statements in the warehouse. Appellants Mendoza and Pardo did not file or join in similar motions or proffers of anticipated testimony before trial.

Judge Robinson ruled on these motions immediately prior to the commencement of the trial (Tr. 17–29). The trial judge first stated: "What is the proffer that is expected out of his [Corbett's] testimony? *Who was going to call him as a witness?*" (Tr. 17, emphasis supplied). Counsel for appellant Tate responded "I intend to;" counsel for appellant Goodwin responded "I would call him as well, your Honor" (Tr. 17). *Counsel for appellants Mendoza and Pardo stood silent.* Counsel for Tate offered that Corbett would testify that Tate said nothing inside the warehouse and that Tate did not do anything else incriminating (Tr. 18). Counsel for Goodwin offered that Corbett would testify that Goodwin's involvement in the transaction was purely accidental, that Corbett had first met Goodwin that day (Tr. 18). Counsel for both Tate and Goodwin promised to limit examination to the events occurring at the warehouse; no background or unrelated testimony would be sought. Counsel for Mendoza and Pardo made no offer of any need or desire for Corbett's testimony.

---

**14.** *See* note 11, *supra.*

**15.** A further part of the plea arrangement was that Corbett would agree *not* to testify for the defense in the present case. In the tendering of Corbett's guilty pleas to District Judge Aubrey Robinson, defense counsel noted that "the government has a concern that or wants to be certain that Mr. Corbett will not come in and testify in either 79–74 or in what the Court has characterized as the big case [the present case, 79–73]." Corbett plea transcript, March 20, 1979, p. 3. In accepting Corbett's guilty pleas, the trial judge inquired: "You understand fur-

ther that if I accept your plea that you will not be permitted to testify on behalf of the remaining defendant, in which there is a single codefendant, or any of the remaining defendants in 79–73. Do you understand that?" *Id.* at 10–11. In later supporting Corbett's right to refuse to testify at trial, however, the Government specifically disclaimed any right to enforce this part of the plea agreement, and solely asserted Corbett's Fifth Amendment rights. (Tr. 22).

**16.** Record on appeal, document 24.

Counsel for Corbett responded that Corbett would invoke the Fifth Amendment if called to the stand. Counsel expressed a fear that cross–examination of Corbett might touch upon matters which would provide "a link or a clue that might well enable the prosecution to charge him with conspiracy in some case where he had a very small part but, nevertheless, would expose him to a possible prosecution" (Tr. 20). The Government fully supported this position (Tr. 21).

The trial court upheld Corbett's invocation of the Fifth Amendment. District Judge Robinson denied the motions of defendants Tate and Goodwin to compel testimony, stating (Tr. 29):

> The privilege has been asserted. The cases are clear that if there is a reasonable prospect that he at any level–the Fifth Amendment privilege covers not only prospective federal prosecutions but prospective state prosecutions–at any level if there is a reasonable prospect that prosecution could occur and not just with respect to matters that grew out of the transaction on December 29th, but any transaction, then Mr. Corbett has a Fifth Amendment privilege that can be asserted. He has asserted it and therefore I will not compel his testimony.

All four appellants appeal this ruling of the trial judge. To resolve this issue properly, however, we must consider appellants Mendoza and Pardo separately from appellants Tate and Goodwin.

## A. *Mendoza and Pardo*

Before considering the more difficult questions presented by this issue, this court is faced with an insurmountable obstacle with respect to appellants Mendoza and Pardo: never once did these appellants raise this issue in the trial court. Neither Mendoza nor Pardo ever suggested to the trial judge that they desired Corbett's testimony. Neither Mendoza nor Pardo ever made any showing as to what Corbett would say in their behalf if compelled to testify.[17] When the trial judge *specifically* asked "[w]ho was going to call him [Corbett] as a witness," both Mendoza and Pardo stood silent (Tr. 17).

■ We hold that in such circumstances, these appellants may not raise this matter for the first time on appeal. We recognize that in certain situations, it may be redundant and inefficient to require each defendant in a joint trial to stand up individually and make every objection to preserve each error for appeal.[18] We certainly do not establish such a requirement. However, that is not the case presented here. It is not that Mendoza and Pardo failed to object to a trial decision vigorously opposed by others; Mendoza and Pardo failed to make any motion or request in the first place, despite the trial judge's explicit invitation to do so. It is certainly plausible that Mendoza and Pardo did not want Corbett's testimony for tactical reasons known best by them. Now that trial is over, with nothing more to lose, appellants may not latch onto Tate's and Goodwin's motions and obtain a free ride.

It goes without saying that matters not properly raised at the trial court may not be pursued on appeal, unless deemed to be "plain error." Fed.R.Crim.P. 52(b).[19] The error complained of in this case cannot be found to be plain error, however. We do not believe that there can be any error in failing to compel testimony which a defendant does not request. This is especially true in this case where defendants Mendoza and Pardo made absolutely no attempt to put

---

**17.** The only "showing" Mendoza and Pardo have ever made is one sentence in their brief on appeal which states: "Mendoza and Pardo needed it [Corbett's testimony] because of the many questions raised about Lee's credibility as to his version of the words spoken and actions taken by all of the appellants." Appellants' brief, p. 22.

**18.** *See United States v. Brown*, 562 F.2d 1144, 1147 (9th Cir. 1977); *United States v. Lefkowitz*, 284 F.2d 310, 313 (2d Cir. 1960).

**19.** "Plain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court." Fed.R.Crim.P. 52(b).

the witness on the stand, even though they were given a clear and explicit opportunity to raise the issue.[20]

We hold that Mendoza and Pardo lost any right they might have had to compel Clifford Corbett's testimony by failing to ever request that testimony in the trial court. All that these appellants had to do was respond in the affirmative to a simple and direct question raised by the District Court judge. For reasons known only to them, they freely chose not to do so; therefore, appellants Mendoza and Pardo cannot now complain of the consequences of that decision.

### B. *Goodwin and Tate*

Appellants Goodwin and Tate properly raise the difficult question of whether the trial court erred in upholding Clifford Corbett's claim of privilege. Situations such as the present case typically raise a painful choice between a defendant's Sixth Amendment right to procure testimony in his favor and a witness' Fifth Amendment right not to incriminate himself. On careful examination, however, we conclude that the present case presents the less painful conflict between the defendant's Sixth Amendment right to procure testimony and the Government's right to cross-examine the witness offering that testimony.[21]

The Fifth Amendment privilege against self-incrimination is one of the cornerstones of the American constitutional system of criminal procedure and must be liberally construed to achieve its protective purpose. *Maness v. Meyers*, 419 U.S. 449, 461, 95 S.Ct. 584, 592, 42 L.Ed.2d 574 (1975). At the same time, however, the privilege has no application beyond that "protective purpose." As stated by the Supreme Court in *Ullmann v. United States*, 350 U.S. 422, 431, 76 S.Ct. 497, 502, 100 L.Ed. 511 (1956), quoting *Hale v. Henkel*, 201 U.S. 43, 67, 26 S.Ct. 370, 376, 50 L.Ed. 652 (1906):

> The interdiction of the Fifth Amendment operates only where a witness is asked to incriminate himself—in other words, to give testimony which may possibly expose him to a criminal charge. But if the criminality has already been taken away, the Amendment ceases to apply.

In short, the existence of the privilege is not automatic.

**20.** *See Wilkes v. United States*, 419 F.2d 684 (D.C. Cir. 1969). In *Wilkes*, defense counsel attempted to examine a co-indictee against whom the charges were to be dropped at the time of his sentencing for another crime. Defense counsel offered that the witness, named Morgan, would testify that the defendant was not present with him on the day of the robbery. The trial judge concluded (since the charges against Morgan had not yet been dropped) that the risk of self-incrimination was such that the witness should consult with his counsel. When the trial reconvened the following day, the witness was not present; the Assistant United States Attorney informed the court, however, that the witness had consulted with counsel and had decided not to testify. The trial court accepted this representation, and the defense counsel raised no objection.

On appeal, defendant claimed that he had been deprived of his Sixth Amendment right to compel testimony. In particular, he argued that it was plain error for the trial court to fail to require the witness to assert personally his privilege against self-incrimination. Chief Judge Bazelon, writing for the court, disagreed. As stated by the Chief Judge: "In the circumstances of this case, Morgan's brief appearance on the witness stand does not differentiate him from any other prospective witnesses whom appellant's trial counsel might have interviewed but who refused to testify for fear of self-incrimination. Appellant could complain of their failure to explain to the court their reasons for invoking the fifth amendment only if he had insisted that they take the witness stand once they had asserted the privilege. The same is true of Morgan." 419 F.2d at 686.

Appellants in the present case may not have had a right to place a witness on the stand who would validly invoke the Fifth Amendment privilege. But just as in *Wilkes*, appellants cannot complain of an improper invocation of the privilege unless they bring that witness to the attention of the court and force him to assert his privilege before the trial judge. This appellants Mendoza and Pardo did not do; the ruling of the trial judge as to these appellants thus cannot be plain error.

**21.** The Government of course has no Sixth Amendment or other *constitutional* right to cross-examine defense witnesses. This case does not involve the more difficult question presented when a defendant's *constitutional* right to cross-examine is limited by a conflicting constitutional right.

■ It is clear that the privilege against self–incrimination ceases to apply once a witness has been convicted of the offense with respect to which he fears incrimination. As stated in *United States v. Romero*, 249 F.2d 371, 375 (2d Cir. 1957):

> It is well established that once a witness has been convicted for the transactions in question, he is no longer able to claim the privilege of the Fifth Amendment and may be compelled to testify.

*See also In re Liddy*, 506 F.2d 1293, 1299–1300 (D.C. Cir. 1974). The same result of course attaches if the witness pled guilty to the offense in question, rather than being convicted following trial. As recognized by the Supreme Court, a "defendant who enters such a plea simultaneously waives several constitutional rights, including his privilege against compulsory self–incrimination." *McCarthy v. United States*, 394 U.S. 459, 466, 89 S.Ct. 1166, 1171, 22 L.Ed.2d 418 (1969).

■ Similarly, the privilege is also lost with respect to charges or counts of an indictment which are dismissed as part of a plea agreement. This conclusion necessarily follows from the holding of the Supreme Court in *Santobello v. New York*, 404 U.S. 257, 262, 92 S.Ct. 495, 499, 30 L.Ed.2d 427 (1971), that "when a plea rests in any significant degree on a promise or agreement of the prosecutor, so that it can be said to be part of the inducement or consideration, *such promise must be fulfilled*" (emphasis supplied).[22] Since promises to dismiss charges as part of a plea agreement are binding on the Government, a witness may not be exposed to prosecution on those charges, and the need for the privilege is lost.

As a consequence of these principles, it is clear that Corbett faced no further threat of incrimination concerning the events surrounding the sale of cocaine in the warehouse on December 29, 1978. In return for his tendered guilty pleas for sales occurring on November 21, 1978 (Crim. No. 79–74) and November 27, 1978 (Crim. No. 79–72), all charges concerning the events on December 29, 1978 against Corbett were dropped.[23] Corbett could testify concerning the transaction occurring on that date and involving the defendants in this case with absolutely no fear of subjecting himself to further prosecution.[24] As to those events,

**22.** *See also United States v. Alessi*, 536 F.2d 978, 981 (2d Cir. 1976); *Government of Virgin Islands v. Scotland*, 614 F.2d 360, 365 (3d Cir. 1980); Westen and Westin, *A Constitutional Law of Remedies for Broken Plea Bargains*, 66 Calif.L.Rev. 471, 512–28 (1978).

**23.** All charges dropped against Corbett at his sentencing on March 20, 1979 involved events occurring on December 29, 1978. The two counts of the indictment involved in the present case were dismissed (Crim. No. 79–73); three additional counts of Crim. No. 79–72 were also dismissed, each of which involved the narcotics seized from Corbett's apartment by agent Lee immediately following the arrest at the warehouse on December 29, 1978.

**24.** We note that the argument has *never* been made that Corbett had a right to refuse to testify because of the possibility that other charges, such as a conspiracy charge, could be brought against him concerning the events at the warehouse on December 29, 1978. In Corbett's invocation of the Fifth Amendment at trial, Corbett's counsel argued only that the cross–examination of Corbett might provide a link or a clue to involvement in *other* cases (Tr. 20). The Assistant United States Attorney similarly raised the possibility of cross–examination producing clues to *other* transactions (Tr. 21–22). The Government admits that the basis for Corbett's decision not to testify "was his concern that the prosecutor on cross–examination might touch upon matters which would incriminate him and lead to his eventual prosecution for drug related matters *other than those involved in the instant case*." Appellee's brief, p. 8 (emphasis supplied).

The Government has argued no differently on appeal, and has never suggested possible incrimination from testimony concerning the events which occurred on December 29. The Government continues to assert that Corbett's privilege not to testify remained in this case because "he would be questioned about matters *which went beyond the instant case or the other cases in which he had already pleaded guilty*." Appellee's brief, p. 28 n.31 (emphasis supplied).

It is not surprising that the Government has never suggested that Corbett could incriminate himself on other charges, such as conspiracy, resulting from the events occurring on December 29, 1978. Since the Government has never raised this possibility, we need not consider it. We note that if such a claim were made, the strongest possible case would be presented in which to make the argument that the Govern-

therefore, Corbett could be compelled to testify.[25]

■ At the same time, however, it is equally true that a witness does not lose his Fifth Amendment right to refuse to testify concerning *other* matters or transactions not included in his conviction or plea arrangement. As stated in *United States v. Johnson*, 488 F.2d 1206, 1209 (1st Cir. 1973):

> But the waiver of privilege to be inferred. from the guilty plea is only for purposes related to a determination of guilt or innocence of the crime admitted. Pleading guilty to a crime does not waive the privilege not to incriminate oneself at other times in other crimes, any more than conviction of one crime erases the privilege as it relates to others (citations omitted).[26]

Thus, Clifford Corbett could not be compelled to testify concerning any matters which would in fact tend to incriminate him and which were outside the scope of the charges to which he had pled guilty or which had been dismissed as part of the plea arrangement. As to such matters, the privilege would remain.

Defense counsel for Tate and Goodwin repeatedly emphasized at trial that they would *not* question Corbett concerning any matter not a part of the events at the warehouse on December 29, 1978.[27] The Government insisted, however, that if Corbett took the stand, it would have the right to cross–examine Corbett as to matters outside the scope of the charges in the plea arrangement in order to impeach effectively his testimony. It is clear, therefore, that this case does not involve a conflict between Corbett's Fifth Amendment right and the defendants' Sixth Amendment right to procure testimony in their favor.[28] Rather, this case involves a direct conflict between a defendant's Sixth Amendment right to procure testimony and the Government's right to cross–examine the witness offering that testimony.

■ We believe that when a conflict exists between the defendant's Sixth Amendment right to procure testimony in his favor and the Government's right to cross–examine, it is necessary to balance the defendant's need to present the evidence against the Government's ability to cross–examine the witness effectively to guarantee truthfulness and accuracy. Certainly the defendant does not have a blanket right to produce testimony that the Government is completely foreclosed from challenging on cross–examination. But where the rights of the defendant and the Government can be reconciled, the defendant's constitutional right to procure testi-

---

ment must either grant Corbett a limited immunity for his statements from use in any forthcoming conspiracy case, or dismiss the charges against the present defendants.

**25.** The Government begrudgingly acknowledges this conclusion in its own brief. As stated at pp. 24–25 of appellee's brief, "dismissal [of the other charges against Corbett], standing alone, might arguably have invalidated any claim of privilege relating to possible self–incrimination in connection with the specific transaction involved in the instant case. *See United States v. Romero*, 249 F.2d 371, 375 (2d Cir. 1957). However, if Corbett had the potential of incriminating himself in connection with other criminal offenses, the privilege against self–incrimination could still be properly invoked."

**26.** *See also United States v. Roberts*, 503 F.2d 598 (9th Cir. 1974), *cert. denied*, 419 U.S. 1113, 95 S.Ct. 791, 42 L.Ed.2d 811 (1975); *United States v. Trejo–Zambrano*, 582 F.2d 460 (9th Cir.), *cert. denied*, 439 U.S. 1005, 99 S.Ct. 618, 58 L.Ed.2d 682 (1978).

**27.** As stated by counsel for appellant Tate: "I don't want to get into any other background material; I just want the testimony as to the warehouse" (Tr. 18). Similarly, counsel for appellant Goodwin stated, "the only testimony that I would be seeking from Mr. Corbett would pertain to the events that led up to the arrival at the warehouse" (Tr. 18).

**28.** *See Washington v. Texas*, 388 U.S. 14, 87 S.Ct. 1920, 18 L.Ed.2d 1019 (1967); *Chambers v. Mississippi*, 410 U.S. 284, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973). This right derives from the compulsory process clause of the Sixth Amendment, which states that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have compulsory process for obtaining witnesses in his favor." U.S.Const. amend. VI.

mony in his favor must prevail.[29] We hold that such a reconciliation is possible in this case, and that Clifford Corbett should have been compelled to testify concerning the events that occurred at the warehouse on December 29, 1978.

We are compelled to reach this result in the present case for two reasons. Initially, it is clear that defendants had a material need to obtain Corbett's testimony. Agent Lee was the sole witness for the Government in this case; there were no other witnesses to corroborate his testimony. In a case such as the present, with many individuals present at the sale, none of whom the Government had ever encountered before or had any other evidence against, it is possible that Corbett would supply exculpatory testimony exonerating some of the alleged participants.

In addition, it is evident that the Government had an adequate opportunity to cross–examine Corbett in this case. This court is aware that the witness may be under pressure to obscure his testimony. Cross–examination by the Government in a case such as the present is thus important. Nevertheless, we believe that due to the presence of three factors in this case, the Government interest in cross–examination is fully satisfied.

First, and most importantly, we note that the Government will have an unlimited opportunity to cross–examine Corbett as to whatever he may testify concerning the events at the warehouse on December 29. This is not a case in which the witness is attempting to testify "selectively," i. e. to testify concerning certain events on direct examination, but refuse to testify as to those *same* events on cross–examination on the grounds of the Fifth Amendment.[30] As demonstrated above, Clifford Corbett has absolutely no Fifth Amendment right to refuse to testify concerning the events that transpired on December 29. Just as the defendants will have a full right to explore his testimony on that subject on direct examination, so too will the Government be able to subject that testimony to unlimited cross–examination. There may be no guarantee that such cross–examination will uncover every possible falsification in the witness' testimony. If that were the test, however, the defendants' Sixth Amendment right to put on a defense would be meaningless.[31]

Second, it is clear that in this case the Government will have ample opportunity to impeach Corbett collaterally as well. Perhaps most critically, the prosecution will be able in its questioning of Corbett and argument to the jury to suggest any tendency that Corbett may have to testify falsely to exonerate his codefendants or to protect himself from reprisal, especially in light of the fact that Corbett may not be prosecuted for the events in question. In addition, the Government can attempt to impeach Corbett through his guilty pleas to two other offenses.[32] The Government can question

---

**29.** The Supreme Court has recognized the fundamental importance of the Sixth Amendment right of the defendant to procure testimony in his behalf. As stated in *Washington v. Texas*, 388 U.S. 14, 19, 87 S.Ct. 1920, 1923, 18 L.Ed.2d 1019 (1967): "[t]he right to offer the testimony of witnesses, and to compel their attendance, if necessary, is in plain terms the right to present a defense, the right to present the defendant's version of the facts as well as the prosecution's to the jury so it may decide where the truth lies. Just as an accused has the right to confront the prosecution's witnesses for the purpose of challenging their testimony, he has the right to present his own witnesses to establish a defense. This right is a fundamental element of due process of law." As later added by the Court in *Chambers v. Mississippi*, 410 U.S. 284, 302, 93 S.Ct. 1038, 1049, 35 L.Ed.2d 297 (1973),

"[f]ew rights are more fundamental than that of an accused to present witnesses in his own defense."

**30.** *See United States v. Reese*, 561 F.2d 894, 901 (D.C. Cir. 1977), where this court recognized the rule that "a witness may not testify as to the broad outlines of a matter and then assert a privilege as to the particulars."

**31.** In *Washington v. Texas*, 388 U.S. 14, 87 S.Ct. 1920, 18 L.Ed.2d 1019 (1967), the Supreme Court struck down a Texas statute that prohibited principals, accomplices, or accessories in the same crime from serving as witnesses in each other's defense.

**32.** A guilty plea which results in conviction is of course fully equivalent for impeachment pur-

Corbett concerning other matters included in the additional charges that were dropped. All this may be done with no threat of incrimination of Corbett. In short, the prosecution will have ample opportunity to attack Corbett's credibility.[33]

Finally, the Government in this case has made absolutely no showing that there are in fact significant matters which it will be preempted from exploring on cross–examination because of Corbett's privilege against self–incrimination. The Government has merely alluded, rather obliquely, to the possible prosecution of Corbett "for drug–related matters other than those involved in the instant case." *See* appellee's brief, p. 8. However, given the fact that the Government may attempt to impeach Corbett with respect to three separate drug deals, the Government will certainly not be prejudiced if it is prevented from inquiring into other drug–related matters.[34] Furthermore, there has not been the slightest suggestion that any *other* offenses, which the Government would indeed be barred from questioning on, even exist. To deny a fundamental Sixth Amendment right on totally unfounded speculation that matters might exist which the Government will not be able to explore on cross–examination would make the constitutional guarantee a mockery.[35]

For these reasons, we hold that the trial court committed reversible error in refusing to compel the testimony of Clifford Corbett concerning the events of December 29. Corbett has no Fifth Amendment right with respect to those events. While he does retain a Fifth Amendment right with respect to matters not included in his plea arrangement, the Government will have ample opportunity to cross–examine and impeach Corbett should it so desire.[36] Appellants Tate and Goodwin have a right to present Corbett's testimony to the jury; the jury, in turn, is entitled to consider Corbett's testimony, along with any impeachment of the witness, and assign to it whatever value they deem appropriate.[37]

poses to a determination of guilt following trial. A guilty plea is thus fully admissible for impeachment purposes, assuming the prerequisites of Rule 609 of the Federal Rules of Evidence are satisfied. *United States v. Wiesle*, 542 F.2d 61, 62 (8th Cir. 1976).

**33.** We do not mean to suggest what Corbett might say in testimony, nor do we mean to suggest that any testimony that he may give will be discredited. We merely indicate here that the Government will have more than an adequate opportunity to cross–examine Corbett and, if necessary, to attempt to impeach him.

**34.** It is interesting to note that the Government investigation of Corbett did not begin until November 15, 1978. *See* Corbett plea hearing, conducted before Judge Aubrey Robinson on March 20, 1979, at p. 21. Corbett was indicted for sales occurring on November 21 and 27 and, of course, for the major sale occurring December 29, 1978. While it is certainly possible that other transactions occurred in that brief time, there is nothing in the record describing such matters.

**35.** We note that our ruling here closely parallels the result reached by this court in *Ellis v. United States*, 416 F.2d 791 (D.C. Cir. 1969). In that case, the court held that a witness who testified before the grand jury could be compelled *by the Government* to repeat that testimony at trial and could not invoke the Fifth Amendment as to matters already testified to before the grand jury. The court noted, however, that the privilege remained with respect to matters not testified to before the grand jury, and that by using the witness at trial the Government ran the risk of mistrial or reversal, since the defendant could not be deprived of his Sixth Amendment right to confrontation. *Id.* at 803.

In the present case, the roles of the parties are reversed. The defendant is here seeking to present the testimony, armed with a constitutional right; the Government is seeking full cross–examination, but without a constitutional guarantee. If true in *Ellis* when offered by the Government, it is certainly true here that the testimony may be presented. And while the defendant in this setting does not "run the risk of mistrial or reversal," we have included a similar protection by requiring a balancing between the defendant's need to present the testimony and the Government's ability to cross–examine. Just as in *Ellis*, the right to present the testimony is not absolute.

**36.** The same of course holds true for defense counsel, should Corbett's testimony strengthen the Government's case.

**37.** As a final matter, we note that cases are legion in cutting off a *defendant's constitutional* right to cross–examine a Government witness because that witness has invoked the Fifth Amendment on cross–examination or because

Accordingly, we reverse the convictions of appellants Tate and Goodwin, and remand this case for a new trial.[38]

## III.

■ Finally, appellants Mendoza and Pardo claim that the trial judge erred in denying their motions for acquittal at the close of the Government's case. For the purposes of reviewing the denial of such a motion, we of course must view the evidence in the light most favorable to the Government, drawing all legitimate inferences from that evidence. *United States v. Foster*, 584 F.2d 997, 1000 (D.C. Cir.), *cert. denied*, 439 U.S. 1006, 99 S.Ct. 620, 58 L.Ed.2d 682 (1978). A defendant is entitled to a judgment of acquittal only when there is not sufficient evidence upon which a reasonable juror could find guilt beyond a reasonable doubt. *United States v. Whetzel*, 589 F.2d 707, 711 (D.C. Cir. 1978). It is the rule in this circuit that only the evidence presented as part of the Government's case in chief may be considered. *United States v. Davis*, 562 F.2d 681, 684 (D.C. Cir. 1977); *United States v. Watkins*, 519 F.2d 294, 297 (D.C. Cir. 1975).

In the testimony offered against appellant Mendoza, Agent Lee stated that he first saw Mendoza when he entered the office of the warehouse (Tr. 71).[39] When Lee later went up to the mezzanine, Mendoza was standing at the top of the stairs in front of the desk (Tr. 73–74). The following exchange then occurred, as described by Lee at trial:

After he [Tate] placed the bag on the table, I asked whether the cocaine had been tested. I believe I directed my question to Mr. Mendoza who was standing directly to my left. Mr. Mendoza responded to the negative. He just stated, no, it hadn't been tested. (Tr. 75).[40]

Nothing further was done or stated by Mendoza on the mezzanine. Lee did testify that Mendoza had turned as if to walk down the stairs when Lee gave the signal to the agents outside (Tr. 77–78). At that time, Lee drew his revolver and made Mendoza come back to the top of the stairs and line up against the wall (Tr. 78).

The evidence against appellant Pardo may be recounted with little difficulty. The sole evidence against Pardo is that he was present on the mezzanine at the time when the brown paper bag was on the desk. Agent Lee admitted that the plastic bags of cocaine were never taken out of the paper bag (Tr. 216). Pardo was standing away from the stairs, behind the desk, and behind appellant Tate (Tr. 74). Agent Lee had never seen Pardo before (Tr. 74). At no point during the events in question did Pardo ever do anything other than stand in the twelve by fifteen foot mezzanine area behind the desk and Tate. At no point during the events in question did Pardo ever utter one word. In fact, Pardo apparently did not understand English very well, for he needed an interpreter at trial (Tr. 3–5).

■ On the facts in this case, we hold that the evidence against Mendoza was suf-

impeachment was deemed adequate. *See United States v. Haro*, 573 F.2d 661 (10th Cir.), *cert. denied*, 439 U.S. 851, 99 S.Ct. 156, 58 L.Ed.2d 155 (1978); *United States v. Nogueira*, 585 F.2d 23 (1st Cir. 1978). In *Haro*, the witness was permitted to testify on direct that he *observed* the burglary, and invoke the Fifth Amendment on cross–examination by the defense when asked whether he *participated* in the burglary. 573 F.2d at 669. We do not comment on the propriety of such a ruling; we simply note that the prohibition against further inquiry has often been invoked against the defendant, *despite* a defendant's constitutional right to confrontation.

**38.** As a result of our disposition of this issue, we need not reach appellants' second claim

that, if Corbett did have a valid Fifth Amendment right, appellants were entitled to obtain his testimony through a grant of use immunity by the Government. *See* Westen, *The Compulsory Process Clause*, 73 Mich.L.Rev. 71, 166–70 (1974); *United States v. Morrison*, 535 F.2d 223 (3d Cir. 1976). We express no view as to the merits of this argument.

**39.** As stated at note 7, *supra*, Lee had previously testified before the grand jury that he first met Mendoza in the mezzanine area of the warehouse (Tr. 213–14).

**40.** Lee was not able to quote exactly what Mendoza said (Tr. 217). He was certain, however, that Mendoza said more than one word.

ficient to justify submitting the case to the jury. As a result, the verdict of the jury that Mendoza was guilty of the charges brought against him must stand. As to appellant Pardo, however, we find that the evidence was simply insufficient for a reasonable juror to conclude that Pardo was guilty beyond a reasonable doubt. Accordingly, we reverse the conviction of appellant Pardo and direct that the charges against him be dismissed.

As a fundamental matter, a defendant may not be found to be guilty of either possession with intent to distribute a controlled substance in violation of 21 U.S.C. § 841(a), or possession of narcotics in violation of 33 D.C. Code § 402, unless he is found to be in "possession" of the narcotics seized. In the present case, many individuals were found in close proximity to a large quantity of drugs. Given the amount of cocaine involved and the surrounding circumstances of the transaction, there is absolutely no doubt that those who possessed the narcotics did so with the intent to distribute it. The question remains, however, whether each defendant did in fact have "possession" of the narcotics.

The standards by which such a question is resolved are well established. It is "possession" of the narcotics that is necessary under either statute, and not "ownership." *United States v. Davis*, 562 F.2d 681, 690 n.11 (D.C. Cir. 1977). Furthermore, possession may be either "actual" or "constructive." *United States v. Staten*, 581 F.2d 878, 883 (D.C. Cir. 1978). As stated in *Davis*, "[t]o prove constructive possession of narcotics the Government must show that the defendant was in a position or had the right to exercise dominion and control over the drugs." 562 F.2d at 684. Finally, there must be evidence to show that there was a "knowing" possession. *United States v. Watkins*, 519 F.2d 294, 298 (D.C. Cir. 1975).

It is rare that drugs are found to be in the "actual" possession of the defendant; in nearly all cases, the question is whether the Government has sufficiently proven that the defendant was in "constructive" possession of the drugs. So it is in this case. The question that must be considered is whether the defendant knew that he had the right to exercise some control over the narcotics. This is obviously a difficult question of fact, which will nearly always turn on circumstantial evidence. In a normal case it is a question that therefore must be resolved by the jury, after hearing all the evidence and considering all of the inferences therefrom.

Appellant Mendoza presents a close case. We hold, however, that there was sufficient circumstantial evidence to justify submitting the question of guilt to the jury. It is not for this court to decide how we would have voted sitting as a member of that panel. As long as the evidence is such that a reasonable juror could find that the defendant was guilty beyond a reasonable doubt, the decision of the jury must stand. We believe that in the present case there was such evidence.

Appellant Mendoza was present in a small room where a significant quantity of narcotics was being sold. It is not his presence, however, from which the jury may find guilt. Mendoza was directly asked whether the contents of the bag had been tested. Mendoza responded that it had not been tested. From this, a jury clearly could have concluded that Mendoza knew what was in the bag and was in a position to exercise some control over it. Indeed, Mendoza illustrated more than mere knowledge of what was in the bag; he indicated some familiarity with it by demonstrating that he knew it had not been tested. In so doing, Mendoza identified himself as possibly an integral participant in the transaction, that "in some discernible fashion" he had "substantial voice vis-a-vis the drug." *United States v. Staten*, 581 F.2d 878, 884 (D.C. Cir. 1978).

It is of course possible that despite his response to Agent Lee's question, Mendoza was a mere bystander. *That is not the question before us.* It is not the function of this court to substitute its judgment for that of the jury. A reasonable jury could have found that Mendoza's response to a direct question, highly relevant to the transaction and indicating a strong likeli-

hood of knowledge and a stake in the outcome, established that Mendoza was in some position to exercise control over the drugs. It was not error, therefore, to submit the question of Mendoza's guilt to the jury.

Appellant Pardo presents a different case. The sole piece of evidence against Pardo is that he was present in a confined area where a drug transaction was obviously taking place. One principle of law firmly rooted in this circuit is that *mere presence at the scene of a drug transaction or mere proximity to drugs seized is not sufficient to establish guilt.* As stated in *United States v. Staten*, 581 F.2d 878, 884 (D.C. Cir. 1978):

> Mere presence of the accused on the premises, or simply his proximity to the drug, does not itself enable such a deduction [of constructive possession]. Nor is mere association with another, standing alone, enough even when the other is known to possess the drug (footnotes omitted).

In short, there must be something more than mere presence at the scene of a criminal transaction. There must be some action, some word, or some conduct that links the individual to the narcotics and indicates that he had some stake in them, some power over them. There must be something to prove that the individual was not merely an incidental bystander. It may be foolish to stand by when others are acting illegally, or to associate with those who have committed a crime. Such conduct or association, however, *without more,* does not establish the offenses here charged.

In *United States v. Watkins*, 519 F.2d 294 (D.C. Cir. 1975), the defendant was found in a bedroom of an apartment. Substantial amounts of heroin and cash were found under the mattress. Books were found in the apartment containing defendant's name, and articles of her clothing were apparently found in the bedroom. This court reversed the defendant's drug–related conviction, noting that the mere fact that the defendant was arrested in the bedroom where the narcotics were found, with books bearing her name in the closet, did not show facts that would permit a reasonable juror to find the element of possession beyond a reasonable doubt. *Id.* at 298.

The facts in *United States v. Bethea*, 442 F.2d 790 (D.C. Cir. 1971), are even more illustrative. In that case, appellant was one of three men observed sitting in a parked car. As police officers approached the car, another individual in the back seat placed a gun behind the seat. A subsequent search of the car revealed three loaded pistols and nineteen capsules of heroin. This court again reversed appellant's conviction, stating that "[m]erely showing that appellant was a passenger in the car and in proximity to the heroin is, without more, insufficient to support a finding of possession." *Id.* at 793.[41]

In the present case, the Government has done nothing more than show Pardo's proximity to the narcotics in question, and his association with others who apparently were in possession of the drugs. As stated in *United States v. Holland*, 445 F.2d 701, 703 (D.C. Cir. 1971), where the court reversed a drug conviction due to the insufficiency of the evidence to prove constructive possession:

> It is perfectly true that this appellant may be guilty. The trouble with absence of evidence is that it is consistent with *any* hypothesis (emphasis in original).

Similarly, in the present case it is certainly possible that Pardo was in a position to

---

41. *United States v. Bethea* was very recently followed by this court in *United States v. Whitfield*, 629 F.2d 136 (D.C. Cir. 1980). In that case, a loaded firearm was found under both the driver's seat and the front passenger's seat of an automobile. Appellant Monroe was sitting in the front passenger's seat. This court reversed Monroe's firearm conviction, finding the facts insufficient to establish constructive possession. As stated by the court: "The Government did not demonstrate that Monroe at any time had ventured under the front seat either to place the gun there or even to have observed it, inadvertently or otherwise." At 143. The court upheld the firearm conviction of the driver, as owner and operator of the car. *Id.*

exercise control over the drugs. On the basis of the Government's evidence, however, so are many other theories. We hold that the evidence against Pardo is such that a reasonable juror could not find guilt beyond a reasonable doubt, and that his motion for acquittal at the close of the Government's case should have been granted.

### IV.

To summarize, we hold that the convictions of appellants Tate and Goodwin must be reversed, with this case remanded for a new trial at the Government's election. The conviction of appellant Pardo is reversed, with directions to dismiss the charges against him. The conviction of appellant Mendoza is affirmed.

*So ordered.*