**UNITED STATES of America**

v.

**Wayne BYFIELD.**

**Crim. No. 89–0322 (JHG).**

United States District Court,
District of Columbia.

July 21, 1992.

Carolyn K. Kolben, Asst. U.S. Atty., Washington, D.C., for U.S.

Jensen E. Barber, Washington, D.C., for Wayne Byfield.

## MEMORANDUM OPINION

JOYCE HENS GREEN, District Judge.

On September 12, 1989, Wayne Byfield ("Byfield") was charged in a two-count indictment with: 1) possession with intent to distribute more than 50 grams of cocaine base on or about August 18, 1989 and/or aiding and abetting in the possession with intent to distribute more than 50 grams of cocaine base in violation of 21 U.S.C. §§ 841(a), 841(b)(1)(A)(iii) and 18 U.S.C. § 2; and 2) using a juvenile to violate the provisions of 21 U.S.C. § 841(a). Count Two of the indictment, alleging a violation of 21 U.S.C. § 845b(a)(1), was dismissed upon the government's motion prior to trial, and the defendant proceeded to trial on Count One.

At the conclusion of the government's case-in-chief, Byfield moved for a judgment of acquittal, which motion was denied. Tr. 154–55.[1] Thereafter, trial counsel, S. Edgar Wilhite ("Wilhite" or "trial counsel"), presented the defense case. Defendant renewed his motion for a judgment of acquittal at the close of all the evidence, and again, defendant's motion was denied. On December 11, 1989, after deliberating for less than two hours, the jury returned a guilty verdict.

On December 18, 1989, Byfield filed a motion, urging this Court to grant a post-trial judgment of acquittal, and on February 16, 1990, the Court issued an Order setting aside the jury verdict. Specifically, the Court held that there was insufficient evidence, as a matter of law, to prove Byfield constructively possessed the cocaine base. On March 29, 1991, the Court of Appeals for the District of Columbia reversed this District Court's decision on the ground that the evidence, including the case presented by defendant's trial counsel, provided "an adequate basis for the jury's guilty verdict." *United States v. Byfield,* 928 F.2d 1163, 1167 (D.C.Cir.1991).

Byfield appeared before the Court for a status hearing on June 26, 1991, at which time he was ordered to be held without bond pending his sentencing on September 5, 1991. Defendant moved for reconsideration of that determination, which motion was denied on July 10, 1991. On August 23, 1991, Byfield submitted a motion to vacate the judgment and sentence based on

---

1. "Tr." refers to the three volume, 301–page transcription of the trial proceedings held on December 6, 7, and 11, 1989.

ineffective assistance of trial counsel.[2] Consequently, by Order dated September 3, 1991, the Court cancelled the sentencing pending a ruling on defendant's motion.[3] For the following reasons, defendant's motion to vacate judgment shall be granted.

## I. BACKGROUND

### A. Government's Case

At trial, the government presented evidence that on August 18, 1989, Byfield and a young girl took Amtrak's "Night Owl" train from New York to Washington, D.C. Thomas Maher ("Maher" or "Detective Maher"), an Amtrak detective, testified that as he walked through the car in which Byfield was seated, he noticed the defendant and a young woman, later identified as "Shirley," sitting together and talking quietly in the second car of the train. Maher further testified on direct examination that as he followed them off the train and into Union Station, they looked nervous.

Byfield had no luggage, and the young girl was carrying a tote bag. They stood next to each other as they rode an escalator from the train platform. Byfield then moved ahead of the girl in the station, but she approached him several times. Byfield again moved ahead, looking back at the girl and motioning downward with both hands, signalling, according to Maher, for Shirley to stay away from Byfield. Maher observed Byfield repeat these hand gestures.

As he was passing into the Main Hall of Union Station, Detective Maher also saw two Metropolitan Police Department ("MPD") detectives on duty in Union Station. Maher and Detective Donald Zattau ("Zattau" or "Detective Zattau"), an MPD officer, together approached the girl.

During a consensual search of her tote bag, the detectives found, among other things, a shoebox containing an old pair of shoes and six plastic bags that held more than 600 grams of cocaine base. The tote bag also contained men's clothing.

William Buss ("Buss" or "Investigator Buss"), another MPD detective, also testified that he had approached Byfield outside the station near the taxicab waiting area. When questioned by the investigator, Byfield said that he lived in New York and was planning to stay in Washington, D.C. for two or three days. Byfield added that he had traveled alone and carried no luggage because he had clothing at the place he was going to visit. Byfield consented to a pat-down search and left after Buss found nothing on him.

Detective Zattau was the third witness who testified on behalf of the government. He indicated that when he noticed Byfield walking through Union Station "[t]he girl was behind him, probably 20, 30 feet behind him." Tr. 83. He approached the young woman and when he asked her if she had a ticket, he testified that "she pointed to Mr. Byfield." Tr. 86.

Detective Zattau, who had conducted the search of the tote bag, testified that the bag contained an Etonics Transam Trainer shoebox for sneakers, size 8½, color white and light grey; a pair of old New Balance shoes; six plastic bags of cocaine base;[4] "a pair of Bermuda-type extra-large shorts;"[5] a "muscle shirt, extra-large, Adidas"[6] and an extra-large, grey muscle shirt; a pair of green shorts, a pair of Champion brand grey shorts, and a pair of "purplish"[7] shorts; socks; and beads. Detective Zattau also testified that no fingerprints had been taken from any of the objects.

---

**2.** As early as June 21, 1991, Mr. Wilhite was aware of defendant's intention to seek a new trial based on trial counsel's ineffective assistance. *See* Motion for Leave to Withdraw as Counsel and Postponement of Sentencing, filed June 21, 1991, at 1.

**3.** Because Byfield has not been sentenced, the Court will treat defendant's motion only as one to vacate judgment, and not to vacate sentence.

**4.** A forensic chemist with the Drug Enforcement Administration ("DEA"), Joseph Bono, testified that the "rock-like material minus the bag … was 607.8 grams." Tr. 125.

**5.** Tr. 91.

**6.** Tr. 91.

**7.** Tr. 92.

At the time of his arrest, Byfield "had a brand new pair of tennis shoes on that were the same Etonic Transam that was marked on the box that the drugs were found in."[8] On direct examination, the government introduced into evidence the old New Balance shoes and asked the defendant to put them on and display them to the jury.

Johnny St. Valentine Brown ("Brown" or "Detective Brown"), a detective with the Morals Division, Narcotics Branch of the MPD, testifying as an expert witness, described the MPD's general procedures for handling narcotic evidence. In addition, he explained that "it's a very common practice, might I add, in that adults will use young people as couriers to transport drugs from one location to another. And, of course, the reasoning behind that being the fact that there's not as much weight on the younger person as it relates to the individual being caught and what could possibly happen after the individual was, say, arrested by a law enforcement agency. So it's very common, it's a very common practice for traffickers of drugs to use young people as couriers." Tr. 145.

## B. The Defendant's Case

At the trial, the defense also presented several witnesses in an attempt to support its theory that Byfield knew nothing about the drugs in the tote bag. Investigator Sat–Kartar Khalsa testified first on behalf of Byfield. He presented several photographs he had taken, one of which showed a closet inside defendant's house in which there was a shoebox labeled "NB." In his opening remarks, Wilhite had indicated that the closet depicted in the photograph was the defendant's closet. Tr. 161.

Shawn Anthony Chambers ("Chambers"), a neighbor of the defendant, also testified that Byfield had spent part of the previous day in New York City with a friend "Larry" at the home of Rhonda Williams ("Williams"). Williams was with a couple of girls, one of whom, Shirley, was later identified as the girl who accompanied Byfield on the train. Chambers also testified that he saw Larry talk to Shirley and that he saw Byfield talk with Williams. "Ali" Zayd Ahmad ("Ahmad"), another witness on Byfield's behalf, confirmed that Williams "came downstairs with another girl." Tr. 189.

Michael Byfield, defendant's brother, also testified that he had permitted Larry to enter the family's home at 1140 East 219th Street in the Bronx, New York, at about 1:00 a.m. on August 17, 1989. Michael Byfield testified that he had later seen Larry looking for something in a downstairs closet. Michael Byfield and defendant's girlfriend both testified that they did not recognize the men's clothing in the totebag.

## II. DISCUSSION

In *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), the Supreme Court established a two-part standard for evaluating claims of ineffective assistance of counsel:

First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Unless a defendant makes both showings, it cannot be said that the conviction ... resulted from a breakdown in the adversary process that renders the result unreliable.

*Id.* at 687, 104 S.Ct. at 2064.

A defendant raising a claim of ineffective assistance "must identify the acts or omissions that are alleged not to have been the result of reasonable professional judgment." *Id.* at 690, 104 S.Ct. at 2066. However, "our 'scrutiny of counsel's performance must be highly deferential' to avoid holding counsel incompetent because of reasonable strategic or tactical judgments which, with the benefit of hindsight, might

---

**8.** Tr. 100.

prove not to have best served the client's interests. [*Strickland*, 466 U.S.] at 689 [104 S.Ct. at 2065].... Thus, 'the defendant must overcome the presumption' that his counsel's actions 'might be considered sound trial strategy.' *Id." United States v. Loughery*, 908 F.2d 1014, 1018 (D.C.Cir. 1990).

The defendant also bears the burden of proving that the attorney's deficiencies resulted in prejudice. Specifically, a defendant must show

> that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.

*Id.* 466 U.S. at 694, 104 S.Ct. at 2068.

Having examined the transcripts of the trial, it is clear that defendant's trial counsel made numerous errors that were not the result of reasonable professional judgment or mere strategic decisions, and there is a reasonable probability that, but for trial counsel's errors, Byfield would have been found not guilty.

The defense case, beginning with counsel's opening statement and ending with his closing argument, described a relationship between Shirley and Byfield that was absent from the government's case-in-chief. As illustration, in his opening remarks, Wilhite indicated that Shirley had been with the defendant the day before Byfield and the young woman traveled to Washington. As trial counsel predicted in his opening statement, "[Y]ou'll hear testimony that when my client arrived on the scene, that is, on Sherman Avenue, and Rhonda called down to him from the window, when she came down the street, the young lady who my client knew as Shirley came—or knew as of that day, Shirley, came with her, that is, with Rhonda down on the street." Tr. 160. Defense counsel also elicited testimony from Chambers and Ahmad confirming that Byfield and Shirley were at Williams' house the day immediately preceding his arrest.

Similarly, counsel informed the jury in his opening that both Larry and the "little girl" were at defendant's house the day before the arrest and that Larry drove both Byfield and Shirley to the train station on the morning of defendant's arrest. As Wilhite put it, "But in any event, eventually Larry drives Wayne and Shirley to the train station." Tr. 161.

Until defendant's trial counsel presented Byfield's case, no one had placed Byfield with the alleged courier at any time other than on the date of his arrest. As the government conceded on appeal, "A pretravel connection between appellee and the young girl, albeit through Larry, was established by the defense's own evidence.... [H]ad the trial court looked beyond the government's case-in-chief and considered the undisputed evidence of a prior relationship between appellee and the young girl, it presumably would have ruled differently on the motion for judgment of acquittal." Reply Brief for Appellant, attached as Exhibit 7 to Defendant's Motion to Vacate Judgment and Sentence ("Def. Motion"), at 3. And as the Court of Appeals for this Circuit characterized the case:

> One of the crucial links in [the government's] chain of proof is evidence that Byfield and the young girl were travelling together. Although this fact is not undisputed, there is ample evidence from which a jury could infer that they were in fact travelling together, *including evidence presented by the defense about Byfield's meeting with Rhonda Williams and Larry's conversation with the girl prior to their departure.*

*Byfield*, 928 F.2d at 1167 (emphasis supplied).

Trial counsel also crystallized a connection between the defendant and the shoebox containing the drugs. Again, in opening argument, trial counsel suggested that the Etonics shoebox had contained defendant's shoes. As Wilhite explained, "[W]hat we're going to present to you is— [that] this box ... *apparently did contain—did contain the shoes that Mr. Byfield was wearing."* Tr. 159. Defense counsel also suggested that the old shoes contained in the new box had been taken from Byfield's home. In fact, defense counsel introduced numerous photographs of Byfield's residence, including a picture

of Byfield's closet inside of which there was a shoebox labeled "NB," and he referred repeatedly to the closet as "Wayne's closet." Tr. 161, 279. The government clearly recognizes the significance of this testimony: "The defense photo of a New Balance shoebox in appellee's closet also added to the strength of the government's case by further linking appellant to the contents of the totebag." Exhibit 7 to Def. Motion, at 3 n. 2.[9]

In light of these facts, it is evident that "there is at least a reasonable probability— sufficient to undermine any confidence to the contrary—that but for" counsel's errors, Byfield would not have been found guilty. *Loughery*, 908 F.2d at 1019. As defendant succinctly states, "Within a matter of minutes, [trial counsel] puts the Etonic shoes worn by Byfield as apparently coming from the box the courier carried ...; twice places the defendant in the company of the courier in New York, on the day before the arrests ...; states that his client, Mr. Byfield knew the "young lady" as "Shirley" ...; admits the closet in which a New Balance box was found was his client's closet ...; [and] states that his client and the courier were driven from the Bronx to the train station." Def. Motion, at 21.

In addition, although the government had presented some evidence that might suggest that Byfield and the young woman knew each other or were traveling together, it was clearly not conclusive: Byfield did not have Shirley's ticket; it was unknown when or at what point Shirley boarded the train; and only one detective, passing briefly through the car in which the defendant was sitting, even saw Byfield and the young woman together on the train.[10] Moreover, the fact that Byfield gestured to the young woman is consistent with a number of innocent explanations, including "Please, leave me alone."

There is no doubt that "evidence presented by the defense buttressed the government's constructive possession theory and provided an adequate basis for the jury's guilty verdict." *Id.* Under these circumstances, the Court must find not only that trial counsel's performance was deficient, but also that there is a reasonable probability that but for counsel's errors, the jury would have found Byfield not guilty.

### III. CONCLUSION

Accordingly, for the reasons expressed above, it is hereby

ORDERED that defendant's motion to vacate judgment is granted; it is

FURTHER ORDERED that there shall be a status conference on July 28, 1992 at 2:00 p.m. to determine the future progress of this case, including the scheduling of a new trial date.

IT IS SO ORDERED.

---

9. Wilhite also failed to object at critical points in the government's closing argument. As illustration, the prosecutor stated in closing that "[the evidence] adds up to this: the guilt of the defendant in that he was working with a juvenile that day." Tr. 255. The Court, however, had already ruled that the age of the female was hearsay and, thus, should be excluded. *See*

Transcript of Motions Hearing, December 6, 1989, at 33 ("Tr. II").

10. The law is clear in this Circuit that proximity to drugs, association with another in possession of drugs, or knowledge of the presence of narcotics is insufficient to convict a defendant for constructive possession. *See United States v. Pardo*, 636 F.2d 535 (D.C.Cir.1980).